United States Court of Appeals,

Eleventh Circuit.

No. 96-2469.

LAFARGE CORPORATION, Plaintiff-Appellant,

v.

TRAVELERS INDEMNITY CO., Appalachian Insurance Company, Northbrook Insurance Company, Defendants-Appellees,

First State Insurance Company, et al., Defendants.

Aug. 11, 1997.

Appeal from the United States District Court for the Middle District of Florida. (No. 93-475-CIV-T-25C), Henry L. Adams, Jr., Judge.

Before EDMONDSON, Circuit Judge, and KRAVITCH and HENDERSON, Senior Circuit Judges.

PER CURIAM:

The plaintiff-appellant, LaFarge Corporation ("LaFarge"), initiated this action seeking a declaratory judgment that Travelers Indemnity Co. ("Travelers") and a number of other insurance companies[1] were under a duty to defend and indemnify it against claims by the United States Environmental Protection Agency ("EPA") concerning the maintenance of a toxic waste disposal site in Tampa, Florida. The parties eventually filed cross-motions for summary judgment relating to the question of the defendants' liability to defend LaFarge. The district court granted the defendants' motion for summary judgment and denied LaFarge's motion. The court concluded that Florida substantive law governed this dispute and that, under the law of Florida, the defendants did not breach any duty to defend or indemnify LaFarge for the alleged environmental damage at issue here. LaFarge filed this appeal from the final summary judgment. For the reasons stated herein, we affirm the judgment of the district court.

I. FACTS

---

[1] The remaining named defendants were Appalachian Insurance Co., First State Insurance Co., Gibraltar Casualty Co., Highlands Insurance Co., Northbrook Insurance Co. and Puritan Insurance Co. Each of these companies had issued an umbrella or excess coverage general comprehensive liability insurance policy to the plaintiff at some point during the relevant time period leading up to this lawsuit.

For a period of time in the 1970's, the disposal facility was operated as a "borrow pit" from which sand was excavated and sold. The owners thereafter allowed it to be used as a depository area for various waste materials. At about the same time, LaFarge's predecessor in interest, General Portland, Inc. ("GPI"), contracted with Jernigan Trucking Company ("Jernigan") for hauling away waste from its cement operations. Jernigan told GPI that the waste would be hauled to a proper landfill but, for five or six months in 1973, diverted the material to the Tampa location because the owners did not charge for its permanent disposal there. Responding to complaints from nearby property owners, Hillsborough County ordered the Tampa site's owners to cease all dumping in 1976. In state court litigation over contamination from the Tampa site filed in 1978 and made a part of the record in this case, Jernigan was adjudged to be GPI's agent.

At least by 1982, the EPA had begun investigating and preparing for a cleanup at the Tampa pit. LaFarge acquired GPI in 1983. In July, 1988, LaFarge was notified by the EPA that it was being investigated as a generator of toxic wastes at the location. Subsequently, in October, 1990, the EPA informed LaFarge that it had been named a party potentially responsible for the costs of investigating and cleaning up the pollution at the Tampa site under the mandate of the Comprehensive Environmental Response, Compensation, and Liability Act of 1980, 42 U.S.C. § 9607 *et seq.*

From January 1, 1972 through April 1, 1985, Travelers had issued a series of comprehensive general liability insurance policies to GPI and LaFarge. From January 1, 1972 through April 1, 1984, the remaining defendants had sold various umbrella and excess general liability insurance policies to GPI and LaFarge. LaFarge notified Travelers of the EPA proceedings against it in November 1990 and also notified the excess insurance carriers of the EPA's claims.

The insurance contracts issued by Travelers in effect for calendar years 1972 and 1973 and from April 1, 1981 through April 1, 1984 contained the following "expected or intended" pollution exclusion:

[T]his insurance does not apply:

to bodily injury or property damage arising out of any emission, discharge, seepage, release or escape of any liquid, solid, gaseous or thermal waste or pollutant

if such emission, discharge, seepage, release or escape is either expected or intended from the standpoint of any insured or any person or organization for whose acts or omissions any insured is liable.

With one exception, the policies covering the remaining years included the following "sudden and accidental" pollution exclusion:

This insurance does not apply:

to bodily injury or property damage arising out of the discharge, dispersal, release or escape of smoke, vapors, soot, fumes, acids, alkalized, toxic chemicals, liquids or gases, waste materials or other irritants, contaminants or pollutants into or upon land, the atmosphere or any watercourse or body of water; but this exclusion does not apply if such discharge, dispersal, release or escape is sudden and accidental.

The 1984 policy encompassed the following "non-sudden or gradual" language:

This insurance does not apply:

to bodily injury or property damage arising out of any emission, discharge, seepage, release or escape of any liquid, solid, gaseous or thermal waste or pollutant if such emission, discharge, seepage, release or escape is non-sudden or gradual from the standpoint of any insured or any person or organization for whose acts of omissions any insured is liable.

In response to LaFarge's notification of the EPA's potential charges against it, Travelers replied that these pollution exclusion clauses relieved it of any duty to defend LaFarge.

LaFarge then brought this action against Travelers and the excess coverage companies—Appalachian Insurance Co., First State Insurance Co., Gibraltar Casualty Co., Highlands Insurance Co., Northbrook Insurance Co. and Puritan Insurance Co.—seeking a declaration that the defendants had an obligation to defend and indemnify it against the EPA's claims and damages for breach of contract. As stated earlier, Travelers and LaFarge eventually filed cross-motions for summary judgment on the issue of the defendants' liability to defend LaFarge. Appalachian Insurance Co., Gibraltar Casualty Co. and Northbrook Insurance Co. eventually adopted Travelers' motion for summary judgment. On stipulations of the parties, LaFarge's causes of action against First State Insurance Co., Highland Insurance Co. and Puritan Insurance Co.[2] were

---

[2]By the time of its dismissal from the action, Puritan Insurance Co. was known as Westport Insurance Corporation.

dismissed. The district court granted the defendants' motions for summary judgment[3] on the liability issues, denied LaFarge's motion and entered judgment accordingly. LaFarge filed this appeal from the final summary judgment.

## II. STANDARD OF REVIEW

Our review of the district court's grant of summary judgment is plenary, and we apply the same legal standards as those used by the district court. *Hoffman v. Allied Corp.,* 912 F.2d 1379, 1383 (11th Cir.1990). Further, the question of which state's substantive law applies in this diversity action is a legal question entitled to independent review on appeal. *American Family Life Assurance Co. v. United States Fire Co.,* 885 F.2d 826, 830 (11th Cir.1989). The interpretation of an insurance contract is also a matter of law subject to *de novo* review. *Dahl-Eimers v. Mutual of Omaha Life Insurance Co.,* 986 F.2d 1379, 1381 (11th Cir.1993). The district court's factual findings are evaluated under the clearly erroneous standard. *Id.*

## III. DISCUSSION

*A. Choice of Law.*

In this diversity action, the federal courts must apply the substantive law of the forum state, Florida. *Erie Railroad v. Tompkins,* 304 U.S. 64, 58 S.Ct. 817, 82 L.Ed. 1188 (1938); *Keller v. Miami Herald Publishing Co.,* 778 F.2d 711 (11th Cir.1985). This principle extends to the forum state's conflicts of law rules. *Klaxon Co. v. Stentor Electric Manufacturing Co.,* 313 U.S. 487, 61 S.Ct. 1020, 85 L.Ed. 1477 (1941); *American Family Life,* 885 F.2d at 830.

LaFarge stressed in the district court that, under Florida conflicts of law principles, matters concerning the validity and substantive obligation of contracts are determined by the law of the place where the contract is made ("*lex loci contractus* "). Consequently, since the last act necessary to complete these contracts took place in Texas, the law of Texas applies to this case. Travelers, on the other hand, maintained that Florida would apply the "significant relationship" test here and

---

[3]The district court's summary judgment order and judgment do not expressly refer to Gibraltar Casualty Company. The court had earlier granted, however, the parties' stipulated dismissal of two of LaFarge's three counts against Gibraltar. The third claim was covered by the court's grant of Traveler's motion for summary judgment because Gibraltar had adopted the motion.

would hold that Florida law governs the interpretation of the contracts at issue. The district court concluded that the Florida Supreme Court would apply the significant relationship test because all these contracts involve insurance on real property. "Florida has the most significant relationship with this transaction and the parties. The principal risk insured is located in Florida and was contemplated to remain unchanged. Indeed, Florida's interest in adjudicating interests related to pollution damage occurring in the state is substantial. Accordingly, Florida substantive law should govern...." 927 F.Supp. at 1537.

On appeal, LaFarge asserts that the district court erred in its finding that Florida law governs this case because recent decisions from this court and the Florida courts confirm that the Florida Supreme Court would adhere to the principle of *lex loci contractus* to resolve the conflicts of law issue here. It repeats its contention that since the contracts at issue here were finalized in Texas, the law of Texas governs the substantive issues before us. Even if this be true, LaFarge concedes that, on most of the contract law principles implicated by this case, Florida and Texas law are identical. In any event, Travelers urges that the district court correctly followed Florida law in this dispute involving insurance contracts on real property.

Florida courts have traditionally adopted the *lex loci contractus* rule to conflicts of law problems in contract cases and have, thus, looked to the law of the state where the contract was made or was to be performed. *See Goodman v. Olsen,* 305 So.2d 753, 755 (Fla.1974). The Florida Supreme Court has extended that rule to cases involving contracts for automobile insurance, noting the danger of permitting the applicable law to be determined by a party's moving from one state to another in our migratory, transitory society. *Sturiano v. Brooks,* 523 So.2d 1126, 1129-30 (Fla.1988). A panel of this court has concluded, however, that in a case involving an insurance contract on *real* property, the Florida courts would follow the Restatement (Second) of Conflicts of Law and apply the "significant relationship" test and, thereby, the law of Florida. *Shapiro v. Associated International Insurance Co.,* 899 F.2d 1116, 1118-21 (11th Cir.1990). The court held that this would be true even where, as here, the insurance policy covered risks on real estate in more than one state. *Id.* at 1120.

LaFarge correctly points out that a more recent decision from this court held that Florida would use the traditional *lex loci contractus* test in a dispute involving a life insurance policy. *See Fioretti v. Massachusetts General Life Insurance Co.,* 53 F.3d 1228 (11th Cir.1995). The *Fioretti* court noted the *Shapiro* court's reluctance to enlarge Florida's *lex loci contractus* rule to include contracts involving real property because *Sturiano*'s migration rationale was inapposite with immovable property. *Fioretti,* 53 F.3d at 1236 n. 28. The *Fioretti* court decided, however, that the insured risk in a life insurance policy was, like that in the automobile insurance case, mobile and the case was, therefore governed by the Florida Supreme Court's decision in *Sturiano. Id.* at 1236.

Even if we were not bound by the *Shapiro* court's conclusion that the Florida courts would apply the significant relationship test to a contract of insurance on real property in Florida, we find it persuasive and adopt it here. Accordingly, we hold that the district court correctly applied the law of Florida to this dispute over a contract insuring real property in that state.[4]

Before proceeding to the merits, we note that, under the applicable Florida law, a liability insurer's obligation to defend a claim made against its insured must be determined from the allegations of the complaint. *Baron Oil Co. v. Nationwide Mutual Fire Insurance Co.,* 470 So.2d 810, 813 (Fla. 1st DCA 1985). The duty to defend the insured against a claim is distinct from and broader than the duty to indemnify the insured for damages assessed against the insured. *Id.* The district court here held that, since the allegations of fact in the EPA action against LaFarge fell within the various pollution exclusions, "no duty [of Travelers] to defend or indemnify was ever triggered." 927 F.Supp. at 1539. Because we decide that the district court correctly found that Travelers had no duty to defend LaFarge, we do not need to address the indemnification question.

Florida law places on the insured the burden of proving that a claim against it is covered by the insurance policy. *Hudson Insurance Co. v. Double D Management Co., Inc.,* 768 F.Supp. 1542 (M.D.Fla.1991). The burden of proving an exclusion to coverage is, however, on the insurer. *Id.* Neither the Florida Supreme Court nor this court appears to have addressed the question of which

---

[4]Moreover, we note that, since the substantive contract law principles applicable to this case appear to be the same in Florida and Texas, the outcome of this case would be the same even if we applied the law of Texas to these facts.

party bears the burden of proving an *exception* to an *exclusion,* such as the "sudden and accidental" exception to the pollution exclusion clause at issue in this case. In *Hudson Insurance,* however, the United States District Court for the Middle District of Florida concluded that the burden was on the insured. *Id.* This appears to be the majority view. *See Aeroquip Corp. v. Aetna Casualty and Surety Co., Inc.,* 26 F.3d 893, 894-95 (9th Cir.1994).

*B. Pollution Exclusion Clauses.*

1. Sudden and Accidental Exclusion.

The district court found that the policies containing the sudden and accidental exclusion were not ambiguous and provided coverage for the discharge of pollutants only if the discharge was sudden and accidental. The court found that the initial dumping of the wastes at issue was clearly not sudden and accidental and that alone barred coverage. Even accepting LaFarge's insistence that it was the subsequent seepage of pollutants rather than the initial disposal of wastes which must be sudden and accidental, the district court found that the actual contamination from the Tampa site was not sudden and accidental and, therefore, there was no coverage for LaFarge's disposal activities at the site under these circumstances.

On appeal, LaFarge reiterates that the critical event for determining the coverage of this and all the pollution exclusion clauses is not, as the district court found, the initial deposit of wastes at the site but the subsequent release and threatened release of pollutants into the environment. It argues that, if the provision is so construed, Travelers owes it a duty to defend because the EPA complaint did not specify whether the pollution from the site was abrupt or gradual. As noted above, however, the district court found that neither the initial deposit of wastes nor the subsequent seepage of pollution from the site was sudden and accidental. Furthermore, this reasoning is foreclosed by this court's interpretation of a similar provision under Florida law, that "it is the actual discharge, not the resulting damages or contamination, which must be sudden and accidental in order to fall within the exception to the pollution exclusion clause." *Southern Solvents, Inc. v. New Hampshire Insurance Co.,* 91 F.3d 102 (11th Cir.1996).

LaFarge concedes that the Florida Supreme Court has rejected its position on this precise

question.  In *Dimmitt Chevrolet, Inc. v. Southeastern Fidelity Insurance Corp.,* 636 So.2d 700 (Fla.1993), the court held that an almost identical pollution exclusion clause barred coverage unless the discharge is sudden and accidental.  Therefore, pollution which took place gradually over a period of years is not covered.  *Id.* at 705.  While the Texas Supreme Court has not addressed this question, the Fifth Circuit Court of Appeals has reached the same result applying Texas law.  *See Mustang Tractor & Equipment Co. v. Liberty Mutual Insurance Co.,* 76 F.3d 89, 91 (5th Cir.1996).

LaFarge next suggests that the clause at issue is ambiguous and invites our consideration of the regulatory history of the "sudden and accidental" pollution exclusion to determine its meaning.  It claims that the insurance industry represented to state regulatory agencies that these pollution exclusion clauses were intended to preclude coverage only for intentional and irresponsible pollution.

Generally, extrinsic evidence may be used as an aid in interpreting contract provisions only when the language contained therein is ambiguous.  In this case, the district court correctly concluded that the provision was not ambiguous.  The Florida Supreme Court rejected this argument in *Dimmitt.*  According to that court, "[b]ecause we conclude that the policy language is unambiguous, we find it inappropriate and unnecessary to consider the arguments pertaining to the drafting history of the pollution exclusion clause." 636 So.2d at 705.  The Texas Supreme Court has likewise held that the drafting and regulatory history of a pollution exclusion could not be considered when the provision itself was not ambiguous.  *See National Union Fire Insurance Co. v. CBI Industries, Inc.,* 907 S.W.2d 517 (Tex.1995).

Finally, LaFarge complains that the district court's decision, if allowed to stand, would create an absolute pollution exclusion in contravention of the clear language of the policies.  This contention is without merit.  Even with these pollution exclusion clauses, the policies would cover pollution resulting from a genuine accident at an insured's plant or involving an insured's vehicle.  Thus, the district court correctly held that the sudden and accidental pollution exclusion clause bars coverage for the claims at issue here.

2. Non-Sudden or Gradual Exclusion.

The 1984 policy excluded coverage for a discharge which was non-sudden or gradual. The district court reasoned that, because the initial discharge and subsequent contamination were both gradual, any damages arising out of such a discharge were not covered under the policy.

On appeal, LaFarge groups this policy with those containing the "sudden and accidental" exclusion and, by implication, makes the same arguments for reversing the district court's holding with respect to it. Since those arguments have been considered and rejected earlier, the district court's grant of summary judgment with respect to this policy is affirmed.

3. Expected or Intended Exclusion.

The remaining policies precluded relief if the pollution arose from a discharge of waste which was expected or intended. Noting that there was no Florida appellate opinion construing this particular provision, the district court looked to a decision by the United States District Court for the Northern District of Georgia which addressed similar contract rules. In *Damar, Inc. v. U.S. Fire Insurance Co.,* 856 F.Supp. 679 (N.D.Ga.1993), *aff'd,* 21 F.3d 1126 (11th Cir.1994), the court held that, because the initial disposal of waste was intended, the pollution exclusion clause barred coverage. The district court here determined that "since the discharge of waste was clearly intended or expected, and the damage arose out of this discharge, the exclusion applies to bar coverage." 927 F.Supp. at 1539.

LaFarge again emphasizes, as it does with respect to the other provisions, that the district court focused on the wrong event. In its view, it is not the initial disposal of waste but the subsequent release of pollutants which must be intended or expected to bar coverage. At the outset, Travelers concedes that the courts of Florida and Texas have not authoritatively addressed this particular language. It argues, however, that the *Damar* court properly focused on the distinction between the discharge and the resulting damage. Travelers contends that it is only the discharge of wastes which must be intended or expected, not the resulting contamination or damage.

This is probably the closest point in the case. It appears, however, that a majority of the courts which have considered the question agree that coverage is barred on similar facts. *See, e.g., Anaconda Minerals Co. v. Stoller Chemical Co.,* 773 F.Supp. 1498, 1506 (D.Utah 1991), *aff'd,* 990

F.2d 1175 (10th Cir.1993).  As the Tenth Circuit explained in that case, this result is reached because, while the language of the pollution exclusion clauses varies, the terms "accidental" and "unexpected or unintended" in these clauses have the same meaning.  *Id.,* 990 F.2d at 1177 n. 2. Therefore, the clauses should be construed similarly.  Common sense suggests that they were drafted to achieve the same result.  Moreover, this court's decision in *Southern Solvents* indicates that it is the discharge of wastes which must be expected or intended, not the resulting environmental damage.  *See* 91 F.3d at 105.  Accordingly, the district court properly found that the non-sudden or gradual pollution exclusion clause bars coverage for these claims.

The district court's grant of summary judgment in favor of the defendants is AFFIRMED.