**WACKENHUT SERVICES, INC., Plaintiff,**

v.

**NATIONAL UNION FIRE INSURANCE COMPANY OF PITTSBURGH, PENNSYLVANIA, a foreign corporation, Defendant.**

**No. 95–2812–CIV.**

United States District Court, S.D. Florida.

July 1, 1998.

Andrew J. Anthony, Coral Gables, FL, for Plaintiff.

William G. Edwards, Miami, FL, for Defendant.

### ORDER GRANTING SUMMARY FINAL JUDGMENT FOR DEFENDANT

JAMES LAWRENCE KING, District Judge.

THIS CAUSE comes before the Court on the parties' cross-motions for summary judgment. Plaintiff Wackenhut Services, Inc. ("Wackenhut") filed both its First Motion for [Partial] Summary Judgment on the Duty To Defend and its Alternative Motion for [Partial] Summary Judgment on the Duty To Defend on December 22, 1997. Defendant National Fire Insurance Company of Pitts-

burgh, Pennsylvania ("National Union") filed its Motion for Summary Final Judgment also on December 22, 1997. The parties both filed responses on January 26, 1998. Finally, Wackenhut filed a reply on February 17, 1998, and National Union filed a reply on February 20, 1998. The Court heard oral argument on the cross-motions for summary judgment on April 9, 1998.

## I. Factual Background

The facts that follow are undisputed. At all relevant times, National Union insured Wackenhut pursuant to Commercial General Liability insurance policies. The provision of these policies that is at the heart of the present dispute can be found in Section I of the policy, which provides coverage for "Personal and Advertising Injury Liability." The policy mandates that such liability be covered by National Union and that National Union must defend any suit seeking such damages.

In 1991, Wackenhut took part in competitive bidding for, and eventually won, a contract with the U.S. Department of Energy ("DOE") to operate the Transportation Safeguards Training Center ("TSTC") at the Kirtland Air Force Base in New Mexico. The Essex Corporation ("Essex") had held this same contract until the bidding took place in 1991. When the contract was awarded to Wackenhut, Essex filed a protest claiming that Wackenhut had unlawfully schemed to take the contract away from Essex. The Essex protest eventually succeeded, and in March 1993 it regained the contract. A protest to the Essex award was then filed by another participant in the 1991 bidding, Pinkerton, who alleged that Essex's bid documents lacked required financial information and contained misrepresentations concerning key personnel that Essex would hire for the work if awarded the contract. The alleged source of Pinkerton's information concerning Essex's misrepresentations was the Wackenhut project manager, Randy Justus. The Pinkerton protest was eventually reviewed and disallowed, but it resulted in a delay before Essex could finally resume its duties for DOE.

### A. The Essex Suit

Essex sued Wackenhut in April 1994 for fraud, civil conspiracy, unfair competition, unfair trade practices, restitution, and for interfering with both Essex's original and 1993 DOE contracts. In its complaint, which was twice-amended by the time the final settlement negotiations took place, Essex alleged several instances of unlawful conduct on the part of Wackenhut. A brief summary of the pertinent allegations and the alleged dates of misconduct, gleaned entirely from Essex's Second Amended Complaint, are key to determining whether coverage exists (all emphases supplied):

4–17–91

Wackenhut's proposal to take over Essex's work, which does not conform to the DOE's bid requirements

6–24–91

Wackenhut's "best and final offer"

8–26–91

DOE reviewing committee advises Wackenhut to receive contract instead of Essex

9–9–91

Essex files administrative protest

9–10–91

Quoting paragraph 23 of the Second Amended Complaint:

23. Not only was Essex's protest valid, but, under applicable procurement law principles, DOE was prohibited from entering into a new agreement with Wackenhut to operate the Training Facility until Essex's protest had been resolved. Therefore, on September 10, 1991, *Wackenhut entered into a scheme with DOE contracting officer Herrera and SEB legal representative Dean Arnold ("the scheme")* in order: (1) to defraud Essex into withdrawing its valid protest; (2) to award improperly the Training Facility Contract to Wackenhut; (3) to make false representations about the Wackenhut bid to Essex and others; (4) to fabricate altered documentation in order to support the wrongful award and to conceal the false representations; (5) to hinder and obstruct the determination of Essex's valid bid protest; and (6) to secure the removal of Essex from the Training Facility nothwithstanding the pendency of Essex's valid bid protest.

9–12, 13–91

Wackenhut employee Randy Justus fraudulently induced others to submit untimely documents in support of Wackenhut's bid

9–24–91

*"Pursuant to the scheme"* between DOE officer Herrera and Wackenhut employees, Officer Herrera writes letter to Essex that falsely induces it to withdraw its protest.

9–25–91

Essex withdraws its protest, thereby resulting in its being dispossessed of revenue from operation of the facility during the protest period.

11–5–91

Essex becomes aware that the information that induced it to withdraw its protest was false, and it therefore files a second protest.

11–26–91

Administrative decision on Essex's second protest, in Wackenhut's favor, based on false information supplied in furtherance of the scheme between Wackenhut personnel and DOE officer Herrera.

12–1–91

Wackenhut takes over the contract to run the training facility.

12–18–91

*"[P]ursuant to their scheme with Wackenhut,* [DOE officers] Herrera and Arnold" file a fraudulent report to cover up the scheme. (Second Am. Compl. ¶ 42.)

4–21–92

Admission under oath by Herrera of fraudulent misconduct, with active complicity (Herrera says) of Wackenhut personnel

3–26–93

Reaward of contract to Essex

4–27–93

Protest to Essex award filed by other bidder, Pinkerton, as product of misinformation about Essex bid from Wackenhut, provided as part of scheme to delay Essex's resumption of contract, to maximize Wackenhut's income during pendency of protest. Quoting paragraph 49:

49. Despite the Decisions of the GAO establishing the wrongful conduct which led to the acceptance of Wackenhut's bid, and despite Wackenhut's failure to comply with DOE's RFP [request for proposal], *Wackenhut continued to scheme to retain operation* of the Training Facility and to deprive Essex of its right to operate the Training Facility. Because Wackenhut had been disqualified from further participation in the bidding process, *Wackenhut determined that it would supply false information to one or the remaining bidders,* Pinkerton Security and Investigation Services ("Pinkerton"), with the object that Pinkerton would utilize that false information to protest the award. Wackenhut's then project manager, Randal Justus, falsely told a vice president of Pinkerton that Essex's updated proposal to DOE misrepresented the availability of personnel proposed to fill key positions under the contract. Wackenhut's project manager made that false representation in order to induce Pinkerton to submit a meritless protest against the reaward so that Wackenhut could retain operation of the Training Facility during the pendency of Pinkerton's protest. Pinkerton's meritless protest was submitted on April 27, 1993, and further delayed Essex's operation of the Training Facility through September, 1993.

10–1–93

Essex finally displaces Wackenhut and resumes operation of the training facility.

Thus, Essex's claims against Wackenhut related to two time segments: the period between 1991 and early 1993, during which it claimed to have been wrongly ousted from its government contract; and from early 1993 to the fall of that same year, during the delay allegedly caused by the pendency of the Pinkerton protest, a protest that Essex claimed was the product of Wackenhut's deception (hereinafter the "ouster claim" and the "delay claim," respectively).

As a result of Wackenhut's alleged misconduct, Essex contended that it lost income from the contract between 1991 and October 1, 1993. It alleged further that income would have been dedicated to the production of a prototype product (unrelated to the training

facility service being provided to DOE) capable of generating millions in profit, for which willing buyers existed, if only the prototype (called "Imsyn") could be built and made to operate as designed. In effect, the complaint alleged that because of the loss of income from the DOE contract, the Imsyn prototype was not built until three years later. In 1994, Essex estimated its losses from delayed production of the prototype and diminution in value of its stock traceable to the loss of the TSTC contract at $33 million. This is the sum it sought from Wackenhut, plus punitive damages for Wackenhut's alleged intentional misdeeds.

In its Complaint, Essex set forth five counts: (1) Intentional and Improper Interference with Continuing and Prospective Contractual Relations; (2) Unfair Competition; (3) Civil Conspiracy; (4) Restitution; and (5) Unfair Trade Practices. At first, National Union defended Wackenhut from the Essex suit. However, after the district court entered an Order dismissing the counts for unfair competition, restitution, and unfair trade practices, National Union withdrew its defense.

In 1996, Wackenhut and Essex settled the *Essex* suit for $4 million. Wackenhut incurred about $320,000 in *Essex*—suit defense expenses that it contends should have been paid by National Union. (The *Essex* court eventually disallowed as too speculative the Imsyn-related damages, which therefore presumably did not form part of the settlement.)

**B.  Coverage Under the Policy**

National Union insured Wackenhut for several successive years, including the years referred to above. In each year, Wackenhut had $5,000,000 in primary liability coverage (less $1,000,000 fronted reinsurance limits with Wackenhut's captive insurer, Titania Insurance Company). The relevant policy terms were the same in each policy year.

National Union's alleged exposure arises from its agreement under Coverage B to "pay those sums that the insured becomes legally obligated to pay as damages because of 'personal injury' or 'advertising injury' to which this coverage part applies," and from its agreement "to defend any 'suit' seeking those damages." (Commercial Liability Coverage Form, attached as Ex. 1 to Def.'s Mot. for S.J. [hereinafter "Policy"], Sec. I, Coverage B.1.a.) Personal injury is defined in Section V of the policy as follows:

> 10. "Personal injury" means injury, other than "bodily injury," arising out of one or more of the following offenses:
>
> a.  False arrest, detention or imprisonment;
>
> b.  Malicious prosecution;
>
> c.  The wrongful eviction from, wrongful entry into, or invasion of the right of private occupancy of a room, dwelling or premises that a person occupies by or on behalf of its owner, landlord or lessor;
>
> d.  Oral or written publication of material that slanders or libels a person or organization or disparages a person's or organization's goods, products or services; or
>
> e.  Oral or written publication of material that violates a person's right of privacy.

The policy's coverage for personal injury is limited, however, by an exclusion for personal injury "arising out of oral or written publication of material, if done by or at the direction of the insured with knowledge of its falsity." (Sec. I, Coverage B.2.a(1).)

**C.  Disputed Coverage Issues**

Wackenhut first contends that Essex's "delay claim" is covered—or at least arguably covered, which would be sufficient to trigger a duty of defense—under subsection (d) of its personal injury coverage, for slander or disparagement. National Union contends that even if the "delay claim" falls within the meaning of that policy term, coverage is nevertheless excluded because Essex clearly alleged in its complaint that the slander or disparagement was "done by or at the direction of [Wackenhut] with knowledge of its falsity."

Wackenhut's second argument is that Essex's "ouster claim" and its "delay claim" are covered—or, again, at least *arguably* covered, thus obligating National Union to have provided a defense to the *Essex* suit—by subsection (c) of its personal injury coverage, for "wrongful eviction from, wrongful entry

into, or invasion of the right of private occupancy of a room, dwelling, or premises that a person occupies by or on behalf of its owner, landlord or lessor." In response, National Union contends that the *Essex* allegations do not fall within the scope of the "wrongful eviction" coverage.

Third, Wackenhut urges that what it characterizes as additional facts relating to the "ouster" and "delay" claims, which were not alleged in the *Essex* complaint but which were known to National Union, enlarged National Union's duty of defense beyond that defined solely by the allegations of the Essex complaint. Wackenhut's principal reference in that regard is to the so-called "Bonhoff memo": a comprehensive pretrial summary by Wackenhut's New Mexico defense counsel outlining what the defense team expected Essex to try and prove at trial, and on what factual claims defense counsel intended to base Wackenhut's defense. National Union contends in this suit that neither the contents of the "Bonhoff memo" nor any other facts or claims extrinsic to the allegations of the *Essex* complaint are relevant to the scope of National Union's duty to defend Wackenhut beyond that point at which it withdrew its defense.

Fourth, Wackenhut argues that opinion statements by National Union's coverage counsel, and communications between National Union's claimsperson and New Mexico defense counsel during the period in which National Union funded Wackenhut's defense (and, later, deposition testimony of National Union claimspeople in this suit) demonstrate that a duty of defense was owed to Wackenhut up and until the conclusion of the *Essex* suit.

Finally, Wackenhut contends that National Union was not entitled to withdraw its defense upon dismissal of certain claims in the *Essex* suit because the order of dismissal necessarily was a nonfinal order, by operation of Federal Rule of Civil Procedure 54(b). National Union contests the application of Rule 54 to the pending coverage issues.

## II. Legal Standard

Summary judgment is appropriate where "there is no genuine issue as to any material fact and . . . the moving party is entitled to a judgment as a matter of law." Fed.R.Civ.P.

56(c); *see Celotex Corp. v. Catrett*, 477 U.S. 317, 322, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). The Court must view the evidence in the light most favorable to the nonmoving party. *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986).

The moving party bears the initial burden of demonstrating the absence of a genuine issue of material fact. If the movant meets this burden, the burden then shifts to the nonmoving party to establish that a genuine dispute of material fact exits. *See Hairston v. Gainesville Sun Publ'g Co.*, 9 F.3d 913, 918 (11th Cir.1993). If the evidence relied on is such that a reasonable jury could return a verdict in favor of the nonmoving party, then the Court should refuse to grant summary judgment. *See id.* at 919. However, a mere scintilla of evidence in support of the nonmoving party's position is insufficient to defeat a motion for summary judgment. *See Anderson*, 477 U.S. at 252, 106 S.Ct. 2505. If the evidence is merely colorable or is not significantly probative, summary judgment is proper. *See id.* at 249–50, 106 S.Ct. 2505.

## III. Analysis

The Court will first determine whether the law of Florida or New Mexico controls the issues in this case. Then the Court will proceed to examine whether National Union had a duty to defend Wackenhut under the policy's "personal injury" section (for the slander and disparagement claims alleged against Wackenhut) and under the policy's "wrongful eviction" section. Finally, the Court will address Wackenhut's arguments regarding the nonfinal nature of the order in the *Essex* suit, which dismissed certain claims, and regarding evidence not contained in the *Essex* complaint.

### A. Florida Law Governs This Case

■ Because this is a diversity action, the Court must apply the substantive law of the forum state, Florida. *See Erie R.R. v. Tompkins*, 304 U.S. 64, 58 S.Ct. 817, 82 L.Ed. 1188 (1938); *LaFarge Corp. v. Travelers Indem. Co.*, 118 F.3d 1511, 1515 (11th Cir.1997). The Court must therefore look to Florida's choice of law rules to determine which state's laws control this case. *See*

*Klaxon Co. v. Stentor Elec. Mfg. Co.,* 313 U.S. 487, 61 S.Ct. 1020, 85 L.Ed. 1477 (1941); *LaFarge,* 118 F.3d at 1515.

In contract disputes, Florida courts generally look to law of the state where the contract was made. *See Goodman v. Olsen,* 305 So.2d 753, 755 (Fla.1974), *cert. denied,* 423 U.S. 839, 96 S.Ct. 68, 46 L.Ed.2d 58 (1975); *Estate of Santos v. Nicole–Sauri,* 648 So.2d 277, 280 (Fla.App. 4th Dist.1995). This rule, known by the archaic label *lex loci contractus,* more specifically "directs that, in the absence of a contractual provision specifying the governing law, a contract (other than one for the performance of services) is governed by the law of the state in which the contract is made, i.e., where the last act necessary to complete the contract is done." *Fioretti v. Massachusetts Gen. Life Ins. Co.,* 53 F.3d 1228, 1235 (11th Cir.1995), *cert. denied,* 516 U.S. 1046, 116 S.Ct. 708, 133 L.Ed.2d 663 (1996). In extending this rule to automobile insurance policies, the Florida Supreme court sought to prevent the danger of permitting the applicable law to be determined by a party's moving from one state to another. *See Sturiano v. Brooks,* 523 So.2d 1126, 1129–30 (Fla.1988) ("To allow one party to modify the contract simply by moving to another state would substantially restrict the power to enter into valid, binding, and stable contract."). In so holding, the *Sturiano* court declined to adopt the "significant relationship" test of the Restatement (Second) of Conflict of Laws.

The Eleventh Circuit has held, however, that Florida courts would not apply the same rule in cases involving an insurance contract on real property. *See LaFarge,* 118 F.3d at 1516; *Shapiro v. Associated Int'l Ins. Co.,* 899 F.2d 1116, 1118–21 (11th Cir.1990). In *Shapiro,* the court reasoned that because real property is stationary and immobile, the policy reasons underlying the *Sturiano* decision were not salient. The court noted that "[u]nlike a contract for automobile insurance where the location of the insured risk can vary as readily and as quickly as an automobile can move, the Associated policy insured against occurrences at The California Club, a risk whose location was unchanging." *Shapiro,* 899 F.2d at 1119. Thus, the court

applied the "significant relationship" test. Employing this same analysis, however, the Eleventh Circuit has also ruled that Florida courts would apply the *lex loci contractus* rule to life insurance policies, because the insured risk in such a case is as mobile as the automobile in *Sturiano.* *See Fioretti,* 53 F.3d at 1236.

In the present case, National Union argues that the Court must adhere to Florida's *lex loci contractus* rule, which would result in the choice of Florida law. Plaintiff contends that the Restatement "significant relationship" test is applicable and that under this test the governing law should be New Mexico. The Court finds that reasoning of both *Sturiano* and *Fioretti* is applicable in the present case. Wackenhut's insurance policy was not one for real property. Instead, as Plaintiff concedes, the policy insured multiple risks in multiple states. Because the location of the insured risk depended on where Wackenhut was operating, the risk was moveable and transitory. There is thus no analogy to the immobile property in *LaFarge.* Therefore, the Court must apply Florida's *lex loci contractus* rule, which in this case results in an application of Florida law because the last act necessary to bind the parties to the contract was performed in Florida.[1]

## B. National Union Had No Duty To Defend

■ The Eleventh Circuit has set forth the well-established parameters of the duty to defend under Florida law: "The duty to defend depends solely on the facts and legal theories alleged in the pleadings and claims against the insured. The duty arises when the relevant pleadings allege facts that 'fairly and potentially bring the suit within policy coverage.'" *Lawyers Title Ins. Corp. v. JDC (Am.) Corp.,* 52 F.3d 1575, 1580 (11th Cir. 1995); *see also National Union Fire Ins. Co. v. Lenox Liquors, Inc.,* 358 So.2d 533, 536 (Fla.1977) ("The allegations of the complaint govern the duty of the insurer to defend."); *Fun Spree Vacations Inc. v. Orion Ins. Co.,* 659 So.2d 419, 421 (Fla.Dist.Ct.App.1995) ("An insurance carrier's duty to defend a

---

1. The parties agree, however, that resolution of most of the contractual issues involved in this case would be the same under both Florida and New Mexico law.

claim depends solely upon the allegations in the complaint."). It follows then that inferences that can be made from the allegations of the complaint "are not sufficient" to trigger the duty to defend. *Fun Spree Vacations*, 659 So.2d at 421 (citations omitted). Consequently, an insurer is relieved of its duty to defend "[i]f the alleged facts and legal theories do not fall within a policy's coverage." *Lawyers Title*, 52 F.3d at 1584.

█ Because the allegations of the complaint alone control, the duty to defend may be triggered even if the alleged facts are untrue or the legal theories unsound. *See id.* at 1580. Moreover, doubts concerning the duty to defend must be resolved in favor of coverage. "If an examination of the allegations of the complaint leaves any doubt regarding the insurer's duty to defend, the issue is resolved in favor of the insured." *Id.* at 1580–81 (citations omitted).

### 1. National Union Had No Duty To Defend the Slander or Disparagement Claims in the *Essex* Case Because They Fall into the Policy's Exclusion for Intentional Acts

█ National Union concedes that paragraph 49 of the Essex complaint (concerning the Pinkerton allegations) arguably alleges personal injury as defined by the policy in that the injury arises out of "[o]ral . . . publication of material that slanders [an] organization or disparages [an] organization's . . . services." National Union argues, however, that these allegations fall within the policy's exclusion for acts done with knowledge of their falsity. If the allegations fall within the exclusion, no duty to defend exists. *See Transcontinental Ins. Co. v. Ice Sys. of Am., Inc.*, 847 F.Supp. 947, 949–50 (M.D.Fla.1994).

Wackenhut does not deny that its project manager made false statements to Pinkerton that resulted in Pinkerton's meritless protest, but insists that paragraph 49 of the *Essex* Second Amended Complaint never explicitly alleged that Wackenhut employee Randall Justus ("Justus") had actual knowledge of the falsity of the statements at the time he made them. Wackenhut thus makes the argument that paragraph 49 might be read as alleging *negligent* misrepresentation—a claim that would entitle Wackenhut to a defense of the entire suit. This argument fails, however, because it conflicts with the express language of paragraph 49, which states that "Wackenhut continued to scheme to retain operation of the Training Facility. . . . Wackenhut determined that it would supply false information to . . . Pinkerton . . . with the object that Pinkerton would utilize that false information to protest the award." Paragraph 49 continues by alleging that Justus carried out that plan: He "made [a] false representation in order to induce Pinkerton to submit a meritless protest."

█ It is clear from the language Essex used in its complaint that Justus knew exactly what he was doing. However, whether *Justus* knew does not matter; what is important is that the insured, *Wackenhut*, knew, and this is made clear by paragraph 49: "Wackenhut determined that it would supply false information." Justus was not a defendant in the *Essex* suit, and is not claiming insured status in the present case. The proper focus is on the nature of *Wackenhut's* alleged misconduct. Essex's language in paragraph 49 (as well as the other language of the complaint) simply cannot be read as an allegation of anything other than intentional behavior, or "oral . . . publication . . . done by or at the direction of [Wackenhut] with knowledge of its falsity."

█ As noted above, an insurer is entitled to rely solely on the allegations contained in the complaint in determining whether it has a duty to defend. Even if, in the underlying suit, the plaintiff could have recovered on a theory of negligence, the insurer still has no duty to defend if the acts as alleged are clearly described as intentional. *See ABC Distr. Inc. v. Lumbermens Mutual Ins. Co.*, 646 F.2d 207, 208–09 (5th Cir.1981) (quoting district court opinion by King, J. stating that "the 'overall scheme' alleged by Lighting Systems in its complaint against [insured] was clearly intentional, as Lighting Systems repeatedly averred, and therefore the complaint came within the intentional act exception to policy coverage").[2] Because the *Es-*

---

2. The Eleventh Circuit has adopted as binding precedent all Fifth Circuit decisions issued prior to October 1, 1981. *See Bonner v. Prichard*, 661 F.2d 1206, 1209 (11th Cir.1981) (en banc).

*sex* complaint alleged only intentional acts, the policy exclusion applies and National Union had no duty to defend. *See Lenox Liquors,* 358 So.2d at 536 (holding that allegations of intentional acts fell outside policy coverage).

Wackenhut relies heavily on *Lime Tree Village Community Club Ass'n, Inc. v. State Farm Gen. Ins. Co.,* 980 F.2d 1402 (11th Cir.1993), in support of its contention. that National Union had a duty to defend the *Essex* suit. In that case, the Eleventh Circuit reversed a summary judgment for an insurer that had denied a duty to defend underlying suits filed against the insured village association for amending age-restriction occupancy covenants. Despite the fact that some of the underlying suits' allegations were intentional in nature, the Eleventh Circuit noted that the suits also asserted non-intentional grounds for relief:

> The factual allegations set forth grounds, other than intentional acts and discrimination, upon which Lime Tree could be held liable.... Based on the allegations here Lime Tree could be held liable, for example, for unintended slander of title and unintended restraint of trade.

*Id.* at 1405–06 (footnote omitted). The court's conclusion rested on its finding that the underlying complaints against the insured alleged facts that could "fairly and potentially bring the cases within [the policy] coverage." *Id.* at 1407.

The Eleventh Circuit thus found that the complaints' allegations left open the possibility that Lime Tree Village might be liable for unintended effects of its actions because they did not assert claims for *intentional* slander of title or *intentional* disparagement of title. Rather, as the court noted, the underlying suits in *Lime Tree Village* asserted intentional conduct (amendment of the covenants) that may have *resulted in* "slander or disparagement of title." For example, the court observed, "That Lime Tree intentionally passed the amendment [changing the age-restrictive covenant] does not foreclose the possibility that Lime Tree could have unintentionally breached the Covenants while attempting to comply with the Fair Housing Amendments Act." *Id.* Thus, the underlying suits reviewed in *Lime Tree Village* —fairly read—included

covered claims for unintended injury (although founded on intentional misconduct).

When National Union denied further defense to Wackenhut, however, no such inadvertent legal injury was at issue in the *Essex* suit. Rather, line-by-line review of Essex's Second Amended Complaint discloses a successful effort by Essex to allege, unambiguously and exclusively, only intentional misconduct resulting in the intended injury to Essex. Indeed, Count I for Intentional Interference, Count III for Fraud, and Count V for Civil Conspiracy, are claims that constitute, by definition, intentional misconduct. Moreover, the general allegations that precede the separate counts, as well as the allegations of the counts themselves, exclusively allege intentional misconduct. Indeed, the Court finds it difficult to understand how Wackenhut could have schemed and conspired through the use of fraudulent statements to obtain the contract (as alleged in the complaint) without having knowledge of the statements' falsity. The *Essex* complaint clearly asserts that Wackenhut was plotting to deprive Essex of the contract; if Wackenhut did not know of the falsity of its representations, no such plotting could have occurred. In fact, it is impossible to infer a cause of action for negligence without contradicting the complaint in its entirety, or assuming that negligence is a "lesser-included offense" implicit in every claim for intentional misconduct. Moreover, even if it were possible to posit an inference consistent with a duty of defense without contradicting the express allegations of the Essex complaint, "[i]nferences are not sufficient" bases for determining a duty of defense. *Fun Spree Vacations, Inc. v. Orion Ins. Co.,* 659 So.2d 419, 421 (Fla.Dist.Ct.App.1995); *see also Ice Sys.,* 847 F.Supp. at 949 (looking solely to "four corners of the complaint" to determine whether insurer had duty to defend).

Count II for Unfair Competition, Count IV for Unfair Trade Practices, and Count VI for Restitution were dismissed by the district court on September 13, 1995. It was only *after* that dismissal—sought and obtained by counsel for Wackenhut (not National Union)—that National Union withdrew its defense of the *Essex* suit. Because the poten-

tially covered claims were no longer part of the case, National Union's withdrawal was proper. *See Baron Oil Co. v. Nationwide Mut. Fire Ins. Co.,* 470 So.2d 810, 815 (Fla. Dist.Ct.App.1985) (insurer's duty of defense ends when covered claims have been eliminated).

The court therefore determines that the Essex "delay claim" is not covered, and did not require National Union to defend the *Essex* suit.

### 2. National Union Had No Duty To Defend Because No Wrongful Eviction Occurred

■ Wackenhut also asserts coverage for "personal injury," relating to both *Essex's* "ouster" and "delay" claims, on the basis of another policy section, which requires defense for:

The wrongful eviction from, wrongful entry into, or invasion of the right of private occupancy of a room, dwelling or premises that a person occupies by or on behalf of its owner, landlord or lessor.

(Policy, Sec.V.10.c.) Wackenhut claims that its alleged interference with Essex's government contract, by which Essex lost the right to conduct and be paid for training operations at the DOE facility, amounts to a wrongful eviction of Essex or a wrongful entry by Wackenhut.

Wrongful entry or wrongful eviction cases, however, generally involve something lacking in this case: either a defendant landlord who wrongfully evicts a plaintiff tenant or licensee; or a plaintiff who is an owner of real property, or holds a tenancy or easement in real property, who complains either of wrongful eviction by an owner or landlord, or wrongful entry by another in derogation of the plaintiff's ownership, tenancy, or easement.

Essex never claimed to be a tenant of the Department of Energy. It neither alleged that it paid rent nor that it paid for an easement. It certainly did not allege that it owned the site where its DOE training contract was performed. The concepts of wrongful eviction and wrongful entry are irrelevant in the context of Essex's allegations. *See City of Delray Beach v. Agricultural Ins. Co.,* 85 F.3d 1527, 1534 (11th Cir.1996) (not-

ing that in Florida "invasion of the right of private occupancy means an offense tantamount to wrongful entry or eviction and requires an impingement upon possessory rights"). Because Essex never asserted possessory rights to (or a right of private occupancy of) the government facility where it did its training under the DOE contract, no rights to property could have been infringed. Thus, because the Court finds that the *Essex* complaint did not allege a wrongful eviction or wrongful entry, National Union did not owe a duty to defend Wackenhut on that ground.

### C. Statements By National Union Employees Are Extraneous Matters That May Not Be Considered in Determining Whether There Was a Duty To Defend

■ In support of Wackenhut's argument for estoppel or to establish a "party admission" concerning the duties of coverage or defense, Wackenhut relies on testimony of two National Union employees who stated that it was not clear to them whether one of the allegations in Essex's First Amended Complaint provided the potential for coverage. In other words, Wackenhut argues that these statements establish objective ambiguity of coverage. Under this analysis, the duty to defend is apparently not a question of objective meaning, but rather is determined by reference to lay impressions.

Contrary to Wackenhut's argument, Florida law provides that the deposition testimony of National Union's employees concerning their opinions about coverage constitutes "extraneous matters" that are completely irrelevant to the determination of whether National Union had a duty to continue its defense of Wackenhut in the underlying suit. *See, e.g., Lenox Liquors,* 358 So.2d at 536; *Fun Spree Vacations,* 659 So.2d at 421; *Marr Invs., Inc. v. Greco,* 621 So.2d 447, 449 (Fla.Dist.Ct.App. 1993). As the Fifth Circuit has explained:

The existence of the obligation to defend arises and must be determined by the claims alleged by the pleadings in the suit, *and not upon the insurer's evaluation of ultimate liability vel non.*

*Coblentz v. American Surety Co. of N.Y.*, 416 F.2d 1059, 1062 (5th Cir.1969) (emphasis added); *see also Marr Invs.*, 621 So.2d at 449 ("[I]n determining if there is a duty to defend, the trial court is restricted to the allegations of the complaint, regardless of what the defendant and others say actually happened.... [T]he trial judge erred in considering extraneous matters in resolving the question as to the duty to defend.") Thus, whether National Union breached its duty to defend Wackenhut under its insurance contract is a question that must be resolved exclusively by an objective comparison of the *Essex* allegations and National Union's policy.

### D. National Union Had No Continuing Duty To Defend After Dismissal of the Potentially Covered Claims

■ Wackenhut's remaining argument is that National Union was obligated to continue its defense following the trial judge's dismissal of the only claim that could plausibly have been interpreted as being covered, because the dismissal was "non final." Wackenhut cites no authority for this proposition, and the Court has found none. As a general rule, a liability insurer's duty to defend continues until the claims giving rise to coverage have been eliminated from the suit. "Once the insurer's duty to defend arises, it continues throughout the case unless it is made clear that the claims giving rise to coverage have been eliminated from the suit." *Baron Oil*, 470 So.2d at 815. Under the reasoning employed by Wackenhut, an insurer's duty to defend can never come to an end during the course of federal litigation, because all orders are nonfinal if entered before a final judgment adjudicating the rights of all parties. The Court declines to adopt Wackenhut's reasoning on this point.

The only *Essex* claim arguably creating a duty to defend was eliminated from the complaint by dismissal, and it was never reinstated. National Union's (arguable) obligation to defend Wackenhut ended at that time. Had the claim been reinstated, Wackenhut presumably would have renewed its claim for defense on that basis, and National Union would have been required to respond to the renewed demand.

### IV. Conclusion

The Court finds that National Union did not have a duty to defend Wackenhut against the *Essex* suit because the policy's exclusion for intentional acts is applicable in light of the allegations in the *Essex* complaint, and because the wrongful entry or eviction section of the policy is inapplicable. Therefore, summary final judgment will be entered in favor of National Union.

Accordingly, after a careful review of the record, and the Court being otherwise fully advised, it is

ORDERED and ADJUDGED that Defendant's Motion for Summary Final Judgment be, and the same is hereby, GRANTED. Final judgment is hereby entered on behalf of Defendant and against Plaintiff. It is further

ORDERED and ADJUDGED that Plaintiff's Motion for Summary Judgment on the Duty To Defend be, and the same is hereby, DENIED. It is further

ORDERED and ADJUDGED that Plaintiff's Alternative Motion for Summary Judgment on the Duty To Defend be, and the same is hereby, DENIED.