[DO NOT PUBLISH]

IN THE UNITED STATES COURT OF APPEALS

FOR THE ELEVENTH CIRCUIT

FILED
U.S. COURT OF APPEALS
ELEVENTH CIRCUIT
AUGUST 31, 2007
THOMAS K. KAHN
CLERK

_____

No. 06-13694
Non-Argument Calendar

_____

D. C. Docket No. 04-60858-CV-JIC

ROGELIO A. MALEK,
f.k.a. Olena Kulbachenko,

                                                        Plaintiff,


ANNA KULBACHENKO,
Trustee For Lena Forre f.k.a. Olena
Kulbachenko,

                                                        Plaintiff-Appellee
                                                        Cross-Appellant,


versus


NEW YORK LIFE INSURANCE CO.,

                                                        Defendant-Appellant
                                                        Cross-Appellee.

_____

Appeals from the United States District Court
for the Southern District of Florida

_____

**(August 31, 2007)**

Before BLACK, CARNES and MARCUS, Circuit Judges.

PER CURIAM:

In 2000, New York Life (NYL) issued three life insurance policies (Policies A, B, and C), totaling $10 million in coverage, insuring the life of Yuriy Kulbachenko, Sr. Two years later, Kulbachenko transferred the policies to his ex-wife, Lena Forre, making her the owner and beneficiary of all three. Only Policy A and Policy B are at issue here. There is no dispute that Policy C was still in force at the time of Kulbachenko's death. Both Policy A and Policy B had a monthly premium payment schedule, with premiums for Policy A due on the 10th of each month and premiums for Policy B due on the 8th of each month. Additionally, both policies contained a "grace period" provision, which allows "31 days from the due date for payment of a premium" with coverage continuing during that period.

Sometime around August 11, 2003, Forre submitted a claim for benefits under the policies to NYL, claiming that Kulbachenko had died in the Ukraine on July 26, 2003. Following its standard procedure for international deaths, NYL suspended premium billing on the policies and instigated an investigation into the claim. The investigation revealed that Kulbachenko had not died on July 26, 2003 and that the Ukranian death certificate offered by Forre was fake. Subsequently, NYL denied Forre's claims on June 22, 2004.

2

The following day, June 23, 2004, NYL sent Forre two letters, entitled "Lapse Notice," requesting payment of all premiums that had accrued during the pendency of the investigation while billing was suspended (August 10, 2003 through August 10, 2004 for Policy A, and August 8, 2003 through August 8, 2004 for Policy B).[1] The accompanying letter stated: "If the total amount of premium and policy loan interest due is not paid within 30 days from the date of this letter, your policy will lapse." The notice further stated that the total amount for each policy was due by July 23, 2004.

Instead of paying the overdue premiums, Forre filed suit against NYL on July 1, 2004, claiming that NYL breached the insurance contracts by refusing to pay benefits based on Kulbachenko's alleged death on July 26, 2003. Accordingly, NYL sent Forre two letters on July 26, 2004 informing her that Policy A and Policy B had both lapsed. NYL applied the remaining cash value of each policy to cover some of the overdue premiums, making the actual lapse dates December 10, 2003 for Policy A and November 10, 2003 for Policy B.

Kulbachenko actually died sometime around August 4, 2004 in the Ukraine.

_____

[1] Forre argues that the notices requested payment for August 2003, which had already been billed, and August 2004, which was not yet due. These alleged errors in the amount requested in the Lapse Notices do not alter the fact that Forre allowed both Policy A and Policy B to lapse by failing to pay the overdue premiums from September 2003 through July 2004.

3

Forre submitted another proof of loss claim on February 9, 2005. That proof of loss included the original Ukranian death certificate as well as a certified copy of the Ukranian court judgment voiding the prior death certificate and issuing a new one. NYL again disputed Kulbachenko's death until his body was exhumed and DNA testing confirmed his identity on January 30, 2006. Forre amended her original July 1, 2004 complaint, asserting a claim regarding the actual death that occurred on August 4, 2004. Both sides filed cross-motions for summary judgment.

The district court determined that Policy A and Policy B were ambiguous with regard to the definition of "premium due date" and as to how the "grace period" provision should apply to overdue premiums following a period of billing suspension. Accordingly, the court construed the policies, as it should have if there were an ambiguity, in favor of coverage. Reading the supposed ambiguity in favor of Forre, the court read the Lapse Notices as establishing a "premium due date" of July 23, 2004 for the overdue premiums on both policies. The court further determined that the 31-day grace period set out in the policies should apply after that date. Such a reading placed Kulbachenko's actual August 4, 2004 death within the period in which the policy was in force, entitling Forre to benefits under both policies. The district court granted Forre's summary judgment motion but

denied her request for attorneys fees.  This appeal followed.

We review the district court's grant of summary judgment <u>de novo</u>. <u>LaFarge Corp. v. Travelers Indem. Co.</u>, 118 F.3d 1511, 1514–15 (11th Cir. 1997). "The interpretation of an insurance contract is also a matter of law subject to <u>de novo</u> review." <u>Id.</u> at 1515.  Furthermore, we are to apply Florida law in analyzing the provisions of the insurance agreements at issue here.  <u>See</u> <u>Technical Coating Applicators, Inc. v. United States Fid. & Guar. Co.</u>, 157 F.3d 843, 844 (11th Cir. 1998).

It is well-established in Florida that "an insurer, as the writer of an insurance policy, is bound by the language of the policy, which is to be construed liberally in favor of the insured and strictly against the insurer." <u>Berkshire Life Ins. Co. v. Adelberg</u>, 698 So. 2d 828, 830 (Fla. 1997).  Any ambiguity in the policy must be construed against the drafter.  <u>Purrelli v. State Farm Fire & Cas. Co.</u>, 698 So. 2d 618, 620 (Fla. 2d DCA 1997).  An insurance policy is considered ambiguous "if it is susceptible to two or more reasonable interpretations that can fairly be made." <u>Cont'l Cas. Co. v. Wendt</u>, 205 F.3d 1258, 1261 (11th Cir. 2000)

Here, the district court found the application of the grace period ambiguous in circumstances where premium billing is suspended pending a death investigation.  We disagree.  In essence the district court applied the basic 31-day

5

grace period, which only comes into play where a regular premium payment is due, on top of the 30-day courtesy period extended by NYL for the payment of these overdue premiums. We cannot find support for this interpretation in the language of the two policies.

First, the policies are clear as to what constitutes the "premium due date." They both establish that premiums are to be paid in accordance with the premium schedule set out in the policy. The policies state that premiums are due on or before a specified date each month (the 10th for Policy A and the 8th for Policy B): "Each premium is payable while the Insured is living, on or before its due date as shown in the Premium Schedule on the Policy Data page." Accordingly July 23, 2004, which is neither the 10th nor the 8th of the month, could not have been a "premium due date" within the contemplation of the policy.

Therefore, the "grace period" provision which directly follows the "payment of premiums" subsection discussed above, cannot apply to the July 23, 2004 date. That 31-day window only comes into play with regular monthly premiums due in accordance with the premium schedule set out in the policy. This is the only logical interpretation of this provision.

Furthermore, this interpretation is bolstered by language occurring later in the "Premiums" section of the policy. Addressing how premium payments will be

6

adjusted at death, the policy states: "If the insured dies during a grace period, we will reduce the proceeds by an amount equal to the premium for one policy month." The district court's reading of the policy does not take into account this provision. If the grace period is applied to our facts, as the district court would have it, NYL would only be entitled to reduce the proceeds due Forre by one month's premium, as opposed to the ten months of overdue premiums. The policy would remain in force, and Forre would receive a windfall—full coverage under the policies without paying ten months worth of premiums. This is not a fair interpretation of either policy when read as a whole, as we must. See Dahl-Eimers v. Mut. of Omaha Life Ins. Co., 986 F.2d 1379, 1381 (11th Cir. 1993) (applying Florida law) (noting that a court should read an insurance policy as a whole, and endeavor to give each provision its full meaning and operative effect).

As an alternative justification for its decision, the district court determined that the grace period was tolled pending the resolution of the investigation, because it would be unfair to Forre for the 31-days to run while billing was suspended. Even if that were true, the tolling would logically end on June 22, 2004 when the claims were officially denied and the billing suspension lifted. The 31-day grace period would then restart around June 22, 2004, when the premium payments were again due, and would run for 31 days ending sometime around July

7

23, 2004.[2]  Thus, any grace period logically would have to run concurrent with, not in addition to, the 30-day courtesy period that NYL did extend.

Finally, the language of the Lapse Notices sent differs greatly from the language of the Premium Notices Forre received on a monthly basis.  The Premium Notice sets out the relevant date for premium payment—the 10th for Policy A and the 8th for Policy B.  It makes no mention of a grace period or that the policy will lapse should the premium not be paid.  Conversely, the Lapse Notices sent to Forre specifically state that each policy will lapse if the overdue premiums are not paid within 30 days of the date of the letter.  The Lapse Notices expressly reference the 30-day courtesy period it is permitting in these special circumstances.  Forre does not get an additional 31 days on top of the 30 days already extended by NYL.  Ten months worth of premiums were already well past due, and the letter did not establish July 23, 2004 as a new "premium due date."  Instead, July 23, 2004, was the date on which both policies would officially lapse if the back payments were not timely made.

By failing to pay the overdue premiums, Forre allowed both Policy A and Policy B to lapse.  She was not entitled to an additional 31-day grace period on top

---

[2]  NYL actually suspended billing on August 11, 2003, meaning that one day of the grace period may have already run on Policy A (premiums due on the 10th) and three days may have already run on Policy B (premiums due on the 8th).

of the 30-day courtesy period extended by NYL. As a result, both policies lapsed on July 23, 2004, and Kulbachenko's August 4, 2004 death occurred while neither policy was in force. Forre was not entitled to benefits under either policy. The district court's grant of Forre's summary judgment motion was improper. The district court should have granted NYL's summary judgment motion, and we reverse its judgment and remand with instructions that it do so.[3]

While Policies A and B have lapsed, there is no dispute that Forre is entitled to payment under Policy C. There is a dispute, however, about when NYL was required to start paying Forre interest on the time it took NYL to pay all of the money owed to Forre under the terms of this policy.

Florida law provides that:

> When a policy provides for payment of its proceeds in a lump sum upon the death of the insured, the payment must include interest, at an annual rate equal to or greater than the Moody's Corporate Bond Yield Average-Monthly Average Corporate as of the day the claim was received, from the date the insurer receives written due proof of death of the insured. If the method of calculating such index is substantially changed from the method of calculation in use on January 1, 1993, the rate must not be less than 8 percent.

Fla. Stat. § 627.4615. The district court held, pursuant to § 627.4615, that Forre

---

[3] Because we have determined that Policy A and Policy B both lapsed, we need not address NYL's argument that the district court erred in denying its motion to alter or amend the judgment under Federal Rule of Civil Procedure 59(e). Forre's attempts to recover attorneys' fees are moot as well.

was entitled to interest beginning from February 9, 2005, the date that she delivered to NYL the second Ukrainian death certificate, because the death certificate provided prima facie evidence of "due proof of death of the insured."

NYL contends that Florida law does not provide that a death certificate is prima facie evidence of one's death, and in any event, the Ukranian death certificate that Forre delivered to NYL in this case can hardly be seen as due proof of death, given that the first certificate she delivered was fake. NYL cites to the Fourth District Court of Appeal's recent decision in Great Southern Life Insurance Co. v. Porcaro, 869 So. 2d 585 (Fla. 4th DCA 2004), a case like this one where there was a question for purposes of awarding insurance proceeds about whether the insured was really dead. There, the court held that "death certificates no longer have prima facie evidentiary value outside the context of probate proceedings," and that "[i]t was error for the trial court to accord presumptive evidentiary value to the death certificate, placing the burden on [the insurance company] to demonstrate that [the insured] was alive." Id. at 587.

We agree with NYL that the evidentiary weight of the Ukranian death certificate that Forre delivered on February 9, 2005 was even further diminished by the fact that the first set of Ukranian papers were fake. While death certificates are not bereft of all evidentiary value, id. at 586–87 ("a death certificate obtained

10

through probate proceedings provides some evidence of death"), given the unique facts of this case, the second Ukranian death certificate was not "due proof of death." It was perfectly appropriate for NYL, after it had been provided with one set of fraudulent documents, to require Forre to provide additional evidence of Kulbachenko's death before NYL could reasonably be charged with having received "due proof of death of the insured."

NYL received that additional evidence on January 30, 2006, when it got the results of the DNA test proving that the body found in the Ukraine was Kulbachenko's. NYL concedes that at this point it had "due proof of death," and was required to pay Forre interest pursuant to § 627.4615 on the unpaid portion of the insurance proceeds owed to her under Policy C.

We agree. The district court erred in concluding that Forre was owed interest on Policy C from February 9, 2005, the date she delivered the second death certificate. On remand, the district court should amend its judgment to calculate the interest NYL owes under § 627.4615 from the start date of January 30, 2006.

**REVERSED** and **REMANDED**.