648 So.2d 277 (1995)
In re ESTATE OF Luis Joaquin NICOLE SANTOS, Deceased.
Lourdes S. NICOLE, Appellant,
v.
Katherine NICOLE-SAURI, Isabel Nicole-Sauri and Eugenie Nicole-Sauri, Appellees.
No. 93-1163.
District Court of Appeal of Florida, Fourth District.
January 4, 1995.
*278 Eduardo N. Colon and Robert W. Crawford, Fort Lauderdale, for appellant.
Linda Ann Wells and William J. Palmer of Fine Jacobson Schwartz Nash & Block, Miami, for appellees.
POLEN, Judge.
Lourdes S. Nicole, wife of the decedent and personal representative of decedent's estate, appeals from a partial summary judgment entered in favor of appellees, Katherine Nicole-Sauri, Isabel Nicole-Sauri and Eugenie Nicole-Sauri. Appellees petitioned below to surcharge appellant for breach of fiduciary duty in connection with decedent's estate. The court held that a prenuptial agreement that appellant and the decedent spouse executed in Puerto Rico determining her rights to certain assets accumulated during the marriage would be subject to interpretation under Puerto Rican law. This ruling had the effect of requiring appellant to return to the decedent's estate all assets transferred from decedent to her during the marriage and left for further determination only the identification and nature of the assets.[1] We affirm in part, reverse in part and remand.
The decedent, Dr. Luis Joaquin Nicole Santos and appellant (respondent below), Lourdes Santiago Santos, were married in Ponce, Puerto Rico, on January 4, 1969, while they were residents of Puerto Rico. Prior to their marriage, the parties entered into a prenuptial agreement. At that time, the decedent was 66 years old and recently divorced from his first wife, by whom he had three children, Katherine, Isabel and Eugenie Nicole-Sauri, appellees. The decedent was an optometrist, farmer and merchant and possessed substantial assets at the time the parties married. Appellant, on the other hand, was a secretary who possessed no assets. After the marriage, the parties continued to live in Puerto Rico until 1981, at which time they moved to Florida. In 1985, however, they returned to Puerto Rico until 1988.
Decedent's Last Will and Testament, dated April 19, 1988, was executed in Puerto Rico in accordance with the Civil Code of Puerto Rico.[2] The decedent devised one-third of his *279 estate to be equally divided between the six children of his two marriages (or equally between all of his children, should additional children be declared by court decree), one-third of his estate to be equally divided between the three children of his second marriage, and the remaining discretionary one-third as provided in "c," above, to appellant herein. Appellant's one-third was to go to her after providing two club ownerships to his son by his second marriage (valued at approximately $500 total), as well as a house and lot valued at $65,000 to appellant. Four months after executing his Last Will and Testament, Santos executed a power of attorney to appellant. The following month, appellant and the decedent returned to Florida where they resided until decedent's death on May 20, 1989, at age 86.
On July 19, 1989, the Will was admitted to probate in Puerto Rico, after appellant petitioned for its administration. On September 7, 1989, the Will was also admitted to probate in Broward County. Letters of administration were entered in both jurisdictions appointing appellant, Lourdes S. Nicole, as Personal Representative. At the time of his death, Dr. Nicole's probate estate consisted of real property in Puerto Rico with an approximate value of $240,000, and personal property in Florida with an approximate value of $8,000, according to appellant's listing of the decedent's assets. Appellant listed no assets transferred directly to her by the decedent during their marriage, nor did she list assets transferred indirectly by virtue of her exercise of the power of attorney.
From the commencement of the marriage, the parties' joint assets consisted of social security benefits which they commingled and which the decedent invested along with other monies, including $400,000 the parties won as a result of a lottery ticket they purchased jointly in March, 1977. The house to which appellees/petitioners referred to in the Petition to Surcharge was titled to appellant.
Appellees alleged in their petition to surcharge that appellant had violated the prenuptial agreement. The agreement provided that the parties' property, whenever or however acquired, would be kept separate and apart. Appellees alleged that appellant had failed to do this when she transferred certain property to her name during the marriage prior to decedent's death. The petition further alleged that said transfer violated not only the prenuptial agreement, but also violated the Civil Code of the Commonwealth of Puerto Rico.[3] As personal representative of the estate, appellant had breached her duty to take possession of all the property or assets belonging to the estate and her duty to maintain an action to recover possession of said property if the holder refused to relinquish same. The petition further stated that appellant personally had possession of property belonging to the estate and had failed to relinquish the property. As such, appellees also claimed that appellant had acted in bad faith.
In her response to the Petition for Surcharge, appellant admitted that she executed the prenuptial agreement, but raised several affirmative defenses, all of which were stricken by the trial court by orders dated January 7, 1992, and June 9, 1992. Pursuant to requests from both appellant and appellees, the trial court took judicial notice of certain portions of the Civil Code of Puerto Rico. The trial court found that the prenuptial agreement was governed by the laws of Puerto Rico and that appellant's affirmative defense of abandonment (i.e., that she and the decedent had abandoned the prenuptial agreement prior to his death) was not available under Puerto Rican law. The second order struck appellant's defense of estoppel (appellant claimed in her response that petitioners/appellees *280 could not seek any relief which would not be available to the decedent and were therefore barred by the doctrine of estoppel).
Pursuant to appellees' subsequent Motion for Partial Summary Judgment, the trial court, in granting same, found in pertinent part:
1. There are no genuine triable issues of material fact with respect to the matters raised in Petitioner's Motion for Partial Summary Judgment.
2. It is undisputed that Decedent and Respondent entered into the antenuptial agreement at issue in Puerto Rico.
3. It is undisputed that, as of the date of the antenuptial agreement, Respondent had no money or property of any kind.
4. It is undisputed that Decedent and Respondent never entered into a subsequent agreement affecting the antenuptial agreement.
The court noted that it had previously ruled that the laws of Puerto Rico governed the antenuptial agreement and, under Puerto Rican law, the agreement could not be changed or abandoned by the decedent and appellant. As a result, all of appellant's transfers of property that was properly part of the decedent's estate were null and void, except for "moderate gifts bestowed on festive days for the family." The trial court entered partial summary judgment for appellees and ordered that all assets or the fruits its thereof in appellant's possession which in any way originated from the decedent's assets be returned to the estate to allow them to pass pursuant to the decedent's Last Will and Testament. The court also ordered that the nature and amount of the assets to be returned by appellant to the estate would be determined at a subsequent hearing, after which judgment concerning those issues would be entered.
The forum court must initially apply its own conflict of law rule with respect to a contract in order to determine the law it must apply. See Jemco, Inc. v. United Parcel Service, 400 So.2d 499 (Fla. 3d DCA 1981), rev. denied, 412 So.2d 466 (Fla. 1982). In the case of contract, Florida follows the conflicts of laws rule that the United States Supreme Court established in Scudder v. Union Nat'l Bank, 91 U.S. 406, 23 L.Ed. 245 (1876), which holds that in cases where the place of making the contract and performing it are not the same, then the laws of the place in which it was made shall govern matters of execution, interpretation and validity. Id. at 411. The Florida Supreme Court follows this rule. See Sturiano v. Brooks, 523 So.2d 1126, 1129-1130 (Fla. 1988). The Sturiano Court recognized that the lex loci contractus rule is inflexible, but stated that the inflexibility was necessary to ensure stability in contracts. Under Sturiano, the knowledge that their contract will be governed by the laws of the place the contract is made, is imputed to the contracting parties, unless the contract provides to the contrary. The court reasoned that parties have a right to know what their agreement provides and reaffirmed that lex loci contractus is not an outdated doctrine. Id. at 1129-1130.
Appellant relies on cases that involve real property principles to avoid application of Sturiano and hence, to avoid application of Puerto Rican laws. However, appellant provides no authority to require a different result. It is well-settled that the laws of the situs of real and personal property generally govern the property's transfer, alienation and descent as well as the parties' capacities to contract with regard to that property. See Kyle v. Kyle, 128 So.2d 427 (Fla. 2d DCA 1961), cert. discharged, 139 So.2d 885 (Fla. 1962). As a result, it follows that contracts involving the transfer of real property, or that attempt to create, transfer or somehow affect title to real property would be governed by the laws of the place where the property is situated. This is distinguishable from the instant scenario, however, where the antenuptial contract regulates the parties' interests in each others' properties. Kyle makes this distinction clear.[4] Because in the instant case the antenuptial *281 agreement determined the parties' rights in certain property, that contract must be governed by the laws of Puerto Rico.
We further hold that the fact of property being brought to Florida from Puerto Rico does not affect the outcome of this "conflicts of law" issue. See Quintana v. Ordono, 195 So.2d 577 (Fla. 3d DCA 1967), cert. discharged, 202 So.2d 178 (Fla. 1967); In re Siegel's Estate, 350 So.2d 89 (Fla. 4th DCA 1977), writ discharged, 366 So.2d 425 (Fla. 1978).[5] The Quintana Court held that the law of the situs controls the property within its borders, but "one spouse's interests in movables acquired by the other during the marriage are determined by the law of the domicile of the parties when the movables are acquired." Id. at 579-580. The court held that this rule applied where the money used to purchase the movables was earned from services rendered in a place other than the place of domicile. Otherwise, there would be no logical method of determining marital interest in movables.
In Siegel, the court needed to determine ownership of a note and mortgage, where the husband sold a parcel of property he owned alone and took back a purchase money mortgage in both his name and his wife's. The property was located in New York, where the couple lived at the time. They later moved to Florida, where Mr. Siegel died. Under Florida law, where a note and mortgage is titled under the names of a husband and wife, a tenancy by the entireties is created and it becomes the wife's property upon the husband's death. In New York, however, the same facts would lead to one-half passing to the wife and one-half passing to the husband's estate. The issue before this court was therefore whether ownership of a promissory note and mortgage, held in an estate by the entireties by spouses residing and domiciled in Florida at the time of the husband's death, was determined by the laws of Florida, or by New York law, the latter being where the property was located and the note and mortgage were executed. The Siegel court determined that to answer the question, it must first decide whether the promissory note and mortgage were "movables," which would render them personal property. Personal property follows the owner to and is governed by the state of the owner's domicile. On the other hand, an "immovable" is governed by the laws of the state in which the immovable is situated. The court resolved the question as follows:
[w]hile it is obvious that the only relationship between the note and mortgage and the State of Florida is the fact that the holder died domiciled in this state, and that any litigation concerning construction of these interests would be pursuant to New York law, it is the opinion of this Court that the property is a "movable" and would pass under the law of the State of Florida.
350 So.2d at 91 (emphasis added) Thus, the result the trial court reached in the instant case is consistent with the reasoning in Siegel.
Appellant challenges the trial court's ruling on public policy grounds. We agree that Florida courts may depart from the rule of comity where necessary to protect its citizens or to enforce some paramount rules of public policy. See e.g., Kellogg-Citizens Nat'l Bank v. Felton, 145 Fla. 68, 199 So. 50 (1940). However, it has also been held that just because the law differs between Florida and another jurisdiction does not in itself bar application of foreign law. See Warner v. Florida Bank & Trust Co., 160 F.2d 766, 772 *282 (5th Cir.1974). In fact, in Continental Mortgage Investors v. Sailboat Key, 395 So.2d 507, 509 (Fla. 1981), the court held that contracts charging interest rates that were usurious under Florida law, where executed in another state, did not sufficiently offend Florida public policy to warrant applying Florida law. Similarly, in Herron v. Passailaigue, 92 Fla. 818, 110 So. 539, 542 (1926), the court held that the public policy interest must be of paramount importance to warrant application of Florida law. In the Sturiano case, the supreme court applied New York law, notwithstanding that said law precluded one spouse's recovery in an action against the other spouse unless the insurance policy expressly provided for the claim, and Florida law did not have that limitation. 523 So.2d 1126. Compare, Gillen v. United Servs. Auto. Ass'n, 300 So.2d 3 (Fla. 1974). In that case, the Florida Supreme Court refused to apply New Hampshire law because New Hampshire permitted an insurer to refuse coverage under a policy where the claimant possessed other insurance coverage. Florida law expressly prohibited this provision, which is not the same as a mere difference or silence by the legislature on the matter. The Florida Legislature unequivocally prohibited what New Hampshire allowed.
We find merit in appellant's public policy argument as it may apply to the parties' home in Plantation, Florida. A citizen's right to homestead protection under our constitution is considered a paramount rule of public policy that would justify our departure from the otherwise applicable rule of comity. See Sherbill v. Miller Manufacturing Co., 89 So.2d 28 (Fla. 1956). Protection of homestead from alienation cannot be waived by contract or otherwise. Id. at 31; see art. X, Sec. 4, Fla. Const.[6] That home was titled in appellant's name and she resided therein whenever the parties were in Plantation, Florida. On remand, we direct the trial court to determine whether the Plantation, Florida home is homestead property.
Appellant's argument that the prenuptial agreement was abandoned or modified prior to the decedent's death is without merit. Neither party disputes that Puerto Rico does not recognize those defenses under the circumstances. Having held that Puerto Rican law applies on this issue, we find that appellant's Florida cases do not control.
We also reject appellant's argument that appellees were estopped from obtaining relief below that the decedent himself could not have obtained under Puerto Rican law. Appellant did not plead estoppel with sufficient specificity. See Florida Dept. of Transportation v. Dardashti Properties, 605 So.2d 120 (Fla. 4th DCA 1992), rev. denied, 617 So.2d 318 (Fla. 1993), and Southeast Grove Management v. McKiness, 578 So.2d 883, 886 (Fla. 1st DCA 1991). Further, had appellant sufficiently pled estoppel, she also could not have prevailed on the merits. Contrary to what appellant argues, she, as personal representative of the estate, and not appellees, stands in the decedent's shoes. Thus, estoppel would not and could not apply to appellees in the manner in which appellant claims it does in this case. In any event, appellant could not legitimately raise the affirmative defense of estoppel because she had actual or constructive knowledge at the time a transfer was made that such a transfer was flawed. See e.g. Schueler v. Franke, 522 So.2d 904 (Fla. 2d DCA 1988), rev. denied, 534 So.2d 399 (Fla. 1988). Appellant was a party to the antenuptial agreement and therefore had actual knowledge that the agreement required that property distribution would be subject to the laws of Puerto Rico. Sturiano, 523 So.2d at 1129-1130.
Lastly, we disagree with appellant that reversal and remand is required for the trial court to determine whether she acted in bad faith, which she contends must be done before *283 she can be found to have breached her fiduciary duty as personal representative. No one disputes that such a determination is irrelevant under the laws of Puerto Rico.
Accordingly, we reverse and remand to the trial court with directions to determine whether appellant's Plantation, Florida home is homestead property under the Florida Constitution.[7]Sherbill. The partial summary judgment is affirmed in all other respects.
In light of Judge Warner's dissent, we also certify the following question to the supreme court as being of great public importance:
DOES THE DOCTRINE OF LEX LOCI CONTRACTUS GOVERN THE RIGHTS AND LIABILITIES OF THE PARTIES IN DETERMINING THE APPLICABLE LAW ON AN ISSUE OF THE VALIDITY OF AN ANTENUPTIAL CONTRACT PRECLUDING CONSIDERATION OF THE SIGNIFICANT RELATIONSHIPS OF THE PARTIES TO FLORIDA OR THE SUBJECT MATTER OF THE CONTRACT?
GLICKSTEIN, J., concurs.
WARNER, J., dissents with opinion.
WARNER, Judge, dissenting with opinion.
The majority's opinion is premised on its conclusion that Florida follows the doctrine of lex loci contractus in all contract conflicts of law questions. It cites Sturiano v. Brooks, 523 So.2d 1126 (Fla. 1988) for that proposition. However, Sturiano involved an automobile insurance policy and the question certified to the court was:
DOES THE LEX LOCI CONTRACUS RULE GOVERN THE RIGHTS AND LIABILITIES OF THE PARTIES IN DETERMINING THE APPLICABLE LAW ON AN ISSUE OF INSURANCE COVERAGE, PRECLUDING CONSIDERATION BY THE FLORIDA COURTS OF OTHER RELEVANT FACTORS, SUCH AS THE SIGNIFICANT RELATIONSHIP BETWEEN FLORIDA AND THE PARTIES AND/OR THE TRANSACTION?
Id. at 1128. The decision of the supreme court was limited in its application to automobile insurance policies:
For these reasons, we answer the certified question concerning conflict of laws in the affirmative, limiting that answer to situations involving automobile insurance policies. (emphasis supplied)
Id. at 1130. In concurring with the result, Justice Grimes expressed his inclination to adopt the significant relationship test with respect to most contracts, although he noted that even under the significant relationship test the automobile policy in question in Sturiano would be construed in accordance with the law of the place of contracting.
In Shapiro v. Associated Intern. Ins. Co., 899 F.2d 1116 (11th Cir.1990), the Eleventh Circuit, construing what it believed the law of Florida to be, applied the significant relationship test to the contract before it. That court recognized that Sturiano was limited to automobile insurance policies and did not generally apply the lex loci contractus doctrine to conflicts questions involving other types of contracts. The Third District has also distinguished the holding of Sturiano in Gordon v. Russell, 561 So.2d 603 (Fla. 3d DCA 1990), and applied the law of Florida in construing a contract, notwithstanding the fact that the contract was entered into in New Jersey.
I would adopt the significant relationship test which is, as Justice Grimes stated in Sturiano, the emerging consensus of courts and legal scholars. Id. at 1130. See Section 188, Restatement (Second) of Conflict of Laws (1971).
I would also expand the majority's public policy argument and apply it to the entire interpretation of the antenuptial agreement. Florida has a strong public policy of fairness in the dealings between spouses. Both our case decisions and statutes bear this out. Certainly if Florida's strong public policy of protection of its citizens from inequitable insurance arrangements can avoid the application *284 of a foreign state's law, as was found in Gillen v. United Services Auto Ass'n, 300 So.2d 3 (Fla. 1974), then I would contend we have an even greater interest in the protection of our residents concerning the domestic agreements they enter into.
A similar case to the present one is found in Gustafson v. Jensen, 515 So.2d 1298 (Fla. 3d DCA 1987). In Gustafson an antenuptial agreement was executed in Denmark similar to the one at issue here. The agreement contained no provision for the wife. The parties moved to Florida where they resided until they divorced. During the marriage the husband tore up the agreement but contended in the later dissolution action that it was error not to uphold the agreement executed in Denmark. The trial court ruled that Florida law applied. The Third District held that the trial court was correct because under a principle of choice-of-laws doctrine, absent proof that foreign law is different from the law of Florida, the court is entitled to presume it is the same. In Gustafson the husband had failed to establish that Danish law was different from the law of Florida.
However, the court went on to state:
It should be remembered that the laws of other nations are enforced by Florida courts only to the extent called for under principles of comity. Where the foreign sovereign has no significant interest in the issue being adjudicated, there is no basis for the invocation of comity. The Florida Supreme Court has expressly held that the principles of comity will not apply where the state in which the contract in dispute was entered into has little or no interest in the matter or controversy. Gillen v. United Services Auto. Ass'n, 300 So.2d 3 (Fla. 1974). Nor will comity be recognized where to do so would bring harm to a Florida citizen or would frustrate an established public policy of this state.
Id. at 1300. In the instant case, the antenuptial agreement appears extremely unfair to the widow. Given the strong public policy of the state to be fair in relationships between husband and wife, it is incumbent on the Florida courts to evaluate this agreement under its laws regarding the enforcement of prenuptial agreements.
I have not analyzed the facts of this case as to whether the significant relationship test would result in the application of Florida law or that of Puerto Rico. The trial court did not engage in that analysis, and the record is not sufficiently developed on the necessary predicates to apply the doctrine. I would hold that the trial court should have applied the significant relationship test and the public policy test rather than the doctrine of lex loci contractus to determine whether Florida law should apply. I would remand to the trial court to make these determinations.
NOTES
[1] We have jurisdiction under F.R.P. 5.100; see also Estate of Bierman, 587 So.2d 1163 (Fla. 4th DCA 1991) (Rule 5.100 has been consistently interpreted to allow appeals from non-final orders that determine the substantial right of a party to pursue a claim in the estate).
[2] The Code requires that a Will provide:

a. One-third of the estate to be divided in equal shares among all of the decedent's children;
b. One-third of the estate to any or all of the decedent's children;
c. The remaining one-third in any manner the testator desires.
[3] The prenuptial agreement was executed in Puerto Rico. Under the agreement's terms, the Civil Code of Puerto Rico would govern the agreement. The Code provided, in pertinent part, that "[a]ll gifts between spouses bestowed during the marriage shall be void" and that any property or securities received by an heir, such as a surviving spouse, from the deceased during the decedent's life, must be brought into the estate after death.
[4] In Kyle, the parties executed an antenuptial agreement while residing in Canada that contained a waiver of dower rights. When the husband thereafter attempted to transfer to his corporation a parcel of real property located in Florida titled in his name only, the court held that the antenuptial agreement itself did not substitute for a waiver of dower rights because it had not been executed as required by Florida law. Id. at 430. However, as appellees correctly indicate, this determination would not affect the husband's ability to bring suit to compel the wife to execute a document to satisfy Florida's requirements (in that case, the antenuptial agreement, under Florida law, needed to be subscribed to by two witnesses) in order to give full effect to his rights under the antenuptial agreement.
[5] Appellee correctly indicates that appellant miscites this case. She quotes from the opinion but identifies the case as Nelson v. Winter Park Memorial Hosp. Ass'n, 350 So.2d 91 (Fla. 4th DCA 1977). That opinion appears at page 91 of the same Southern Reporter volume, but appellant is actually citing to Siegel, which begins on page 89.
[6] Exemptions under section 4 inure to the surviving spouse or heirs of the owner. Art. X, 4(b). In this case, the home is titled in appellant's name. However, given the relative financial circumstances of decedent and appellant, the funds used to purchase the home may be traceable to decedent. While the antenuptial agreement and Puerto Rico's laws would require appellant to return the home to decedent's estate, we hold that section 4(c) prevents application of the rule of comity. That section provides, in pertinent part, that "[t]he homestead shall not be subject to devise if the owner is survived by spouse or minor child."
[7] We recognize that the trial court has yet to complete additional judicial labor to determine the nature and number of specific assets which must be returned to the decedent's estate.