JAMES F. McKAY III, Judge.
 

 |2Integrity Medical Systems Inc., appeals the judgment of the trial court in favor of Nelson Radiology Associates, L.L.C. and Dr. Ava Nelson, awarding the sum of Fifty-Three Thousand Eight Hundred Twenty-Eight Dollars and Twenty-Eight Cents ($53,828.28) plus court costs and attorney’s fees in the sum of Twenty-Six Thousand One Hundred Twenty-Seven Dollars and Thirty-three Cents ($26,-127.33).
 

 FACTS AND PROCEDURAL HISTORY
 

 Dr. Ava Nelson is a radiologist who has practiced in hospitals and community based practices for many years. In September of 1999, she began the process of opening her own outpatient imaging center at 1029 South Dorgenois Street, where she intended to offer mammograms, x-rays, ultrasounds, and bone densitometry studies. The business would be known as Nelson
 
 *1201
 
 Radiology Associates, L.L.C. (“Nelson Radiology”). The imaging center required four essential pieces of medical equipment: an x-ray machine, an ultrasound, a bone densitometer, and a mammogram unit. In November of 1999, Dr. Nelson ^contacted Mr. David Denholtz, the president and sole owner of Integrity Medical Services (“Integrity”), the purpose of acquiring medical equipment for Nelson Radiology. Integrity is in the business of buying and selling new and refurbished medical equipment. Generally, Integrity acquires the used equipment, refurbishes the same, arranges transportation, installs equipment, and services the limited warranties. Based on Dr. Nelson’s representations, Integrity sent her a proposal on November 18, 1999, offering refurbished equipment, without installation. Dr. Nelson accepted the offer to purchase the mammography unit and the bone densitometer.
 

 On November 26, 1999, Dr. Nelson signed an invoice finalizing the deal between herself and Integrity whereby she agreed to purchase a Lunar bone densi-tometer (“densitometer”) for $27,500 and a Bennett Contour mammography (“mammography unit”) unit for $18,500 less a $2,300 good customer discount. The invoice provided that the equipment was to be shipped free on board (F.O.B.) Fort Meyers, Florida. The equipment purchased included 90 day warranties.
 

 After seeking advice from Mr. Denholtz, Dr. Nelson financed the purchases through a leasing company HPSC, Inc. (“HPSC”), located in Boston, MA. Dr. Nelson entered into a lease purchase agreement for the two units with HPSC. Integrity sold the machines to HPSC which in turn leased them to Dr. Nelson for a term of 36 months at a rental rate of $1,405 per month.
 
 [1]
 
 Pursuant to this agreement, Dr. Nelson was given an option of purchasing the equipment for fair Rmarket value at the end of the lease term. Based on this lease purchase agreement, HPSC paid Integrity in full on January 12, 2000. In turn, Integrity purchased a used mammography unit which arrived at its warehouse for refurbishing on January 14, 2000. As a company policy, for each piece of refurbished equipment, Integrity completes a service worksheet. Integrity’s service worksheet on this unit indicated that the four cable mounts checked out good, the tests were “OK”, the focal spots were good, and the x-ray tube had exposure. The compression paddles were broken so they were replaced from stock. Two side paddles were touched up. The unit was cleaned, checked, calibrated and ready for delivery on January 29, 2000.
 

 At Dr. Nelson’s behest, Integrity arranged for the shipping of the units to Dr. Nelson’s clinic in New Orleans from their Fort Meyers warehouse.
 
 [2]
 
 The mammography unit was delivered on February 2, 2000. The densitometer was mistakenly shipped to Seattle, Washington. Due to this shipping error the parties agreed to a replacement unit with the cost of installation included. The unit was delivered on March 13, 2000. There is no mention of any shipping damage on the bill of laden.
 

 Dr. Nelson asserts that there were problems with the mammography unit which was delivered on February 2, 2000. She complains that the unit was damaged, not properly refurbished by Integrity, and improperly packaged thereby rendering
 
 *1202
 
 the unit unusable for the purpose for which it was intended. The alleged ^damages were noticed only after March 9, 2000, when John Mills of Performance Medical came to the office to install the unit. Mr. Mills observed that there were parts missing and that he would be unable to install the unit until the missing parts were replaced. As noted in the trial court’s reasons for judgment, Mr. Mills sent a descriptive list of damaged parts to Integrity; the unit was missing a frame nut plate, a frame spacer, a cover, a wall adapter plate, a wall bracket assembly and a broken plug. More notable, the trial court determined that Mr. Mills did not report the following damaged parts: an x-ray tube, a broken cable, cracked compression paddles, a bent column, and dust in the machine. Upon receiving Mr. Mill’s list, Integrity sent an urgent request to Bennett Mammography Parts Order Department requesting the missing parts. Parts began to arrive at the clinic on March 13, 2000, with the last parts arriving on April 25, 2000. Mr. Mills did not attempt to install the missing parts and power up the unit until May 2, 2000, three months after the unit was delivered. At that time Mr. Mills informed Integrity that the unit was making noise, there was a broken cable on the unit and two compression paddles were cracked. Integrity ordered a replacement x-ray tube at its cost and shipped it to Dr. Nelson on May 30, 2000 and she received it on June 2, 2000. By June 1, 2000, Dr. Nelson made a decision to move the clinic office and did in fact relocate the office to Chef Menteur Highway on July 1, 2000.
 

 On June 4, 2000, Integrity requested that the unit be inspected by Mr. Louis Rodriguez of Tri-State Medical, a company that installs new and used x-ray equipment. Upon inspection, Mr. Rodriguez noticed that the equipment wasj^damaged. He testified that the column was already bolted to the wall but it appeared that the installation was not finished. The column moved, but the compression bars did not, likely due to a broken cable. The column cover and the column itself were the only things upright. The column itself was bent. The main generator was in the room, but still sitting on the side. Some of the boxes were still sealed. Based on Mr. Rodriguez’s report, Integrity suggested that Dr. Nelson return the mammography unit at her cost. Dr. Nelson rejected this offer. On August 4, 2000, Tri-State removed the unit to their warehouse for storage. It remained in their warehouse for over four years until Dr. Nelson discarded the unit at Dr. Nelson’s direction.
 

 Allegedly, as a result of the tardiness in delivery of the missing parts, Dr. Nelson determined that it was necessary to rent a mammography unit from another company.
 
 [3]
 

 On December 26, 2000, Dr. Nelson filed a petition for damages against Integrity seeking to recover the return of the purchase price of the equipment, repair costs, costs incident to the sale, lost business and profits, general damages, attorney’s fees, and court costs. Dr. Nelson asserts that Integrity acted in bad faith and knew that the equipment was defective.
 

 After a two-day trial on the merits, the trial court found that Integrity had breached its warranties of sale and was a bad faith seller under Louisiana’s
 
 *1203
 
 17redhibition law and awarded damages in the amount of $53,828.28, plus attorneys’ fees, costs and interest. The trial court issued reasons for judgment, which included a $30,000.00 general damage award to Dr. Nelson. We agree with the trial court’s application of Louisiana law and determining that the matter lies in redhibition and in assessing costs and attorney’s fees to Integrity. However, we disagree with the determination that Integrity was a bad faith seller and with the trial court’s award of general damages in the sum of $30,000. We further disagree with the trial court's award of incidental damages to Dr. Nelson.
 

 ASSIGNMENTS OF ERROR
 

 On appeal, Integrity raises the following-assignments of error: 1) the trial court erred in awarding general damages in this case; 2) the trial court ignored the plain undisputed terms of the sale; 3) the trial court erred by effectively rescinding the sale; 4) the evidence does not support the trial court’s award of incidental damages; and 5) the trial court erred in awarding attorney’s fees as the defects were not redhibitory.
 

 STANDARD OF REVIEW
 

 A trial court’s fact findings and credibility calls are subject to the manifest error standard of review.
 
 Bailey v. Nunez,
 
 2004-1603, p. 2 (La.App. 4 Cir. 3/2/05), 898 So.2d 589, 591. An appellate court may not set aside a trial court’s finding of fact in the absence of manifest error or unless such finding is clearly wrong.
 
 James v. Jackson,
 
 2004-0912, p. 4 (La.App. 4 Cir. 3/2/05), 898 So.2d 596, 600. However, where the trial court’s decision is based on an erroneous |,.¡interpretation or application of law, rather than a valid exercise of discretion, such an incorrect decision is not entitled to deference by the reviewing court. The appellate court is to determine through
 
 de 'novo
 
 review, whether the trial court’s ruling on questions of law are legally correct.
 
 Hand v. City of New Orleans,
 
 2004-0845, p. 5 (La.App. 4 Cir. 12/22/04), 892 So.2d 609, 612.
 

 DISCUSSION
 

 Based on the record and more specifically the trial court’s reasons for judgment, a number of issues need clarification.
 

 First, concerning the densitometer, the trial court held that the unit was not delivered timely. However, it found that Integrity provided Dr. Nelson with a replacement unit and installed the unit at its cost, thereby saving the plaintiff installation costs. “The court finds that this was a compromise between the parties and that it extinguished the original obligation Integrity owed the plaintiffs regarding the densitometer.”
 

 Another pivotal issue is loss of profits. The trial court, in its reasons for judgment, made a factual determination and concluded that Dr. Nelson’s assertions claiming damages for lost profit were unsupportable particularly based on testimony that the records were shredded. “Considering the law and evidence, the court holds that plaintiffs have not established their lost profits by a preponderance of the evidence and the court awards plaintiffs no sum for that claim.”
 

 A crucial issue in this matter is the plaintiffs claims for loss of intellectual enjoyment. The plaintiff asserted because of Integrity’s actions, her goal of having her clinic up and running was never able to be realized nor did it come to full Rfrnition. As a result she suffered mental anguish: the loss of “intellectual enjoyment”. The trial court, in its reasons for judgment noted:
 

 C.C. article 1998 provides for the recovery of non-pecuniary losses in a breach of contract suit only when the contract
 
 *1204
 
 has “intellectual enjoyment” as its principal or exclusive purpose. While the court has no doubt that Dr. Nelson did sustain mental anguish due to this sale, the court finds that she has not demonstrated by a preponderance of the evidence that she meets the critei’ia needed to recover this anguish. However, the court finds that the plaintiffs are entitled to general damages and cost.”
 

 We agree with the trial court that the plaintiff is not entitled to recover nonpecu-niai*y losses for mental anguish. However, we must clarify the matter to take note that the record is devoid of any evidence substantiating Dr. Nelson’s claim for non-pecuniary damages.
 

 The only issues remaining for this Court to review are the trial court’s award of $30,000, in general damages, the award of attorney’s fees and costs in the sum of $26,127.33 and the balance of the incidental damage award attributable to the mammography unit. We note here that cost of the rental of the substitute unit was rejected by the trial court for a lack of proof, and we sustain that finding.
 

 In its reasons for judgment, the trial court failed to delineate what amounts were to be included as incidental damages. However, based on the record we agree with the list that the appellant has compiled as follows:
 

 Cost of Bennett mammo unit $17,575
 

 Performance Medical Services 1,883
 

 Finance cost to leasing company 3,775
 

 Equipment lease cost 225
 

 Tri-State cost to move unit 371
 

 General damages $30,000
 

 Total: $53,828
 

 We have addressed all of the incidental matters and will address the remaining issues which are contingent upon our determination as to whether or not [inthere was trial court error in the application of Louisiana law over Florida law resulting in the trail court’s application of the laws of redhibition.
 

 CONFLICT OF LAWS ISSUE
 

 The pivotal issue, in this appeal, is to determine if the trial court was correct in its decision to apply Louisiana law to this matter and if the trial court in applying Louisiana law erred in rescinding the sale of the mammography unit under a theory of redhibition. The appellant asserts that Florida law should control the issue of liability. The appellant also argues that the nature, validity, and interpretation of contracts are governed by the law of the place where the contract’s terms are to be performed. Integrity argues that the agreed upon contract occurred in Florida and the invoice read FOB Fort Meyers. As such, the liability falls to the buyer not the seller. Thus, Integrity concludes that the trial court erred in rescinding the sale of the mammography unit and requiring Integrity to return the cost associated with the sale of the unit to Dr. Nelson.
 

 Under Louisiana’s approach to choice of law, we must inquire as to whether there is a true or false conflict of interest.
 
 See Jagers v. Royal Indemnity Co.,
 
 276 So.2d 309 (La.1973). Conflict of Laws is that part of the law of each state which determines what effect is given to the fact that the case may have a significant relationship to more than one state.
 
 Restatement (Second) of Conflict of Law, § 2 (1969).
 
 A false conflict occurs when it is found that only a single state has an interest in the application of its law, and that the other state involved has no interest in the application of its law in the case.
 
 Armstrong v. Land & Marine Applicators, Inc.,
 
 463 So.2d 1327, 1328 (La.App. 5 Cir.1984).
 

 In The application of Louisiana law is mandated pursuant to Louisiana’s choice of law interest analysis. Louisiana’s con
 
 *1205
 
 flict of laws provisions are set forth in Civil Code Articles 3515 and 3537.
 

 Article 3515 provides:
 

 Except as otherwise provided in this Book, an issue in a case having contacts with other states is governed by the law of the state whose policies would be most seriously impaired if its law were not applied to that issue.
 

 That state is determined by evaluating the strength and pertinence of the relevant policies of all involved states in the light of: (1) the relationship of each state to the parties and the dispute; and (2) the policies and needs of the interstate and international systems, including the policies of upholding the justified expectations of parties and of minimizing the adverse consequences that might follow from subjecting a party to the law of more than one state.
 

 La. C.C. art. 3515.
 

 Article 3537 provides:
 

 Except as otherwise provided in this Title, an issue of conventional obligations is governed by the law of the state whose policies would be most seriously impaired if its laws were not applied to that issue.
 

 That state is determined by evaluating the strength and pertinence of the relevant policies of the involved states in the light of: (1) the pertinent contacts of each state to the parties and the transaction, including the place of negotiation, formation, and performance of the contract, the location of the object of the contract, and the place of domicile, habitual residence, or business of the parties; (2) the nature, type, and purpose of the contract; and (3) the policies referred to in Article 3515, as well as the policies of facilitating the orderly planning of transactions, of promoting multi-state commercial intercourse, and of protecting one party from undue imposition by the other.
 

 La. C.C. art. 3537.
 

 In the instant case, the appellant argues that based on the contract between Dr. Nelson and Integrity the F.O.B. designation in the invoice shifted risk of |12damage to the buyer at Integrity’s loading facility in Florida. Implicit in this assertion is that the unit was damaged in transport and not the fault of Integrity.
 

 Integrity overstates the importance of F.O.B. notation in the invoice. The trial court requested that both sides address this issue in terms of procedure and the legal meaning of F.O.B. and the remedies available to enforce contracts. The first issue that the trial court addressed, in its reasons for judgment, was whether this matter is governed by Louisiana or Florida law. The trial court stated: “Under Florida law, the forum court (Louisiana) applies its own conflict of laws respecting a contract to make the initial determination of the law to be applied in such actions.”
 
 In re Estate of Nicole Santos,
 
 648 So.2d 277 (Fla.Dist.Ct.App. 4th Dist.1995),
 
 Jemco, Inc. v. United Parcel Service Inc.
 
 400 So.2d 499 (Fla.Dist.Ct.App. 3rd Dist.1981). The trial court continued in its analysis of the conflict of law issue to conclude that:
 

 The fact that one state has more contacts with the dispute than another state does not require a determination that the law of the first state should be applied. Any analysis conducted under La. C.C. art. 3515 and 3537 is fact intensive. E
 
 DC Contractor Insurance Litigation,
 
 931 So.2d 462 (La.App. 3rd Cir.2006). Fortunately, in this case, the result is the same under Louisiana and Florida law.
 

 Considering the applicable jurisprudence and law, there is no indication that the State of Florida would be more impaired than the State of Louisiana. The
 
 *1206
 
 trial court made a factual determination and concluded that the result would be the same no matter which state’s law was applied.
 

 Germaine to this matter is the expectations of the parties, who at arms length entered into this contract, to have protection under the law. Clearly, it is inconsequential which state’s laws apply as there are adequate protections to all parties under both state laws. We draw the same conclusion as did the trial court | isand find no reason to upset the trial court’s decision to apply Louisiana law to the case
 
 sub judice.
 
 Therefore, we affirm the trial court’s application of Louisiana law to this matter.
 

 REDHIBITORY DEFECTS
 

 We will not again address the laborious details of the specific dates of purchase and untimely delivery as we have noted the dates above. It suffices to say that the units, as the trial court concluded, were untimely delivered. As we have addressed the densitometer unit issue above, we will only address the relevant circumstance surrounding the mammography unit.
 

 The critical issue concerning the mammography unit relevant to the claim of redhibitory defects is not the untimely delivery but the condition in which the unit arrived. More, importantly, is the issue of whether the condition of the unit, upon its arrival at Dr. Nelson’s clinic, reached the level of a redhibitory defect.
 

 The trial court concluded that Integrity was liable in redhibition for the plaintiffs’ damages. In its reasons for judgment, the trial court, taking the evidence as a whole, concluded that “all of the defects in the mammography unit rise to the level of being redhibitory ... In addition, the court finds that the defects existed at the time of the sale and/or occurred during shipping.”
 

 In Louisiana, “[t]he seller warrants the buyer against redhibitory defects or vices in the thing sold.” La. C.C. art. 2520. A defect is redhibitory when it “renders the thing useless, or its use so inconvenient that it must be presumed that the buyer would not have bought the thing had he known of the defect.”
 
 Id.
 
 The existence of this type of redhibitory defect provides the buyer with the right to obtain rescission of the sale.
 
 Id.
 
 A thing can also contain a redhibitory defect when the defect “diminishes its usefulness or its value so that it must be presumed |14the buyer would still have bought it, but for a lesser price.”
 
 Id.
 
 This type of redhibitory defect limits the right of a buyer to seek a reduction of the price.
 
 Id.
 
 Pursuant to La. C.C. art. 2530, the warranty extends only to defects that exist at the time of delivery, and there is a presumption that the defect existed at delivery if the defect appears within three days of delivery. Proof that a redhibitory defect existed at the time of sale can be made by direct or circumstantial evidence giving rise to a reasonable inference that the defect existed at the time of sale.
 
 Boos v. Benson Jeep-Eagle Co., Inc.,
 
 98-1424, p. 3 (La.App. 4 Cir. 6/24/98), 717 So.2d 661, 663. Further, under La. C.C. art. 2521, the seller owes no warranty for defects that were known to the buyer at the time of the sale, or for defects that should have been discovered by a reasonably prudent buyer. La. C.C. art. 2522 requires that the buyer must give the seller notice of a redhibitory defect and allow time for the seller to repair the defect; however, if the seller has actual knowledge of the defect, then no notice is required.
 

 However, not all redhibitory vices or defects justify rescission or reduction of the price. Apparent defects, which the buyer can discover through a simple inspection, are excluded from the seller’s
 
 *1207
 
 legal warranty. La. C.C. art. 2521. A defect is apparent if a reasonably prudent buyer, acting under similar circumstances, would discover it through a simple inspection of the property.
 
 David v. Thibodeaux,
 
 04-0976, p. 3 (La.App. 1 Cir. 5/11/05), 916 So.2d 214, 217. Factors to be considered in determining whether an inspection is reasonable include knowledge and expertise of the buyer, the opportunity for inspection, and assurances made by the seller.
 
 Crow v. Laurie,
 
 98-0648, p. 6 (La.App. 1 Cir. 2/19/99), 729 So.2d 703, 707-708.
 

 | ^Applicable facts to the case
 
 sub judiee,
 
 are that the mammography unit arrived at Dr. Nelson’s clinic on February 2, 2000, but there was no attempt to inspect the unit until March 9, 2000. This Court finds no reasonable explanation for this inaction. Dr. Nelson had hired Mr. John Mills of Performance Medical to install the mammography unit. Upon his inspection of the unit he discovered that it was missing vital parts and other vital parts of the unit were broken. John Mills made a list of parts that he said were missing and drew a sketch of a broken plug, which was faxed to Integrity. Although the defendant made numerous attempts to replace the missing and broken parts throughout the month of March, the last part did not arrive until around April 25, 2000. Mr. Mills did not reattempt to install the mammography unit until May 2, 2000, after the five missing parts had arrived. Integrity maintains that the parts were shipped timely within a reasonable time of the notification of the defects and continues to argue the failure of Dr. Nelson to inspect the unit timely.
 

 Under the circumstances, on the date of initial delivery and even up to the time that Mr. Mills attempted to install the unit it is clear that the mammography unit was defective and could not be used for the purpose for which it was intended.
 

 On June 4, 2000, at Integrity’s request, Louis Rodriguez inspected the mammography unit. Upon inspection, Mr. Rodriguez noticed that the unit was visibly damaged. Mr. Rodriguez opined that the unit’s column being bolted to the wall was indicia of partial installation, but the partial installation had not sufficiently progressed for power to be hooked up to the x-ray tube. Based upon Mr. Rodriguez’s report, Integrity suggested that Dr. Nelson send the 1 ^mammography unit back to them, at her cost, and that they would evaluate it to see if it had been damaged beyond repair. Dr. Nelson rejected this offer:
 
 [4]
 

 In July of 2000, Dr. Nelson terminated her office lease on South Dorgenois and moved the clinic to a new location on Chef Menteur Hwy. She asserts that due to the condition of the mammography unit, she had no choice but to lease another mammography unit with a monthly lease of $450.00 per month, which was less than the fees on the Integrity unit. On August 4, 2000, at Dr. Nelson’s request, Tri-State Medical removed the unit to their warehouse for storage. It is somewhat troubling to this Court that the unit remained in storage with Tri-State Medical for over four years until it was discarded while the current suit was pending, at the request of Dr. Nelson.
 

 Based on the facts we find no error in the trial court’s factual determination that the mammography unit had defects that reached the level of being redhi-bitory thereby rendering the unit unusable for its intended purpose. The buyer would
 
 *1208
 
 not have bought the thing had she known of the defects. We further find it reasonable for the trial court to have concluded that Integrity knew of the defects prior to shipping the unit to Dr. Nelson, but that knowledge does not reach the level of bad faith. There is no conclusive evidence as to when, where and how the damage to the mammography unit occurred. Even the trial court could not make that determination. What can be concluded is that the unit was inoperable and could not be used for the purpose for which it was intended and the return of the purchase price is appropriate. What remains undetermina-ble is the extent of the defects and if any of them occurred while the unit was in transit. Therefore, we | [7find no error in the trial court award for the return of the cost of the unit, $17,575. However, we cannot find supportable evidence to conclude that Dr. Nelson is entitled to any other costs attributable to the defective mammography, specifically:
 

 Performance Medical Services 1,883
 

 Finance cost to leasing company 3,775
 

 Equipment lease cost 225
 

 Tri-State cost to move unit 371
 

 We find merit to appellant’s argument that Dr. Nelson is not entitled to the added incident damages outlined above for a total of $6,254.00 and amend the trial court’s judgment to reflect this ruling.
 

 GENERAL DAMAGES
 

 The appellant asserts that the trial court erred in its award of incidental damages and abused its discretion in awarding general damages in the amount of $30,000. We agree.
 

 The standard of review applicable to a general damages award is the abuse of discretion standard.
 
 Anderson v. Welding Testing Lab., Inc.,
 
 304 So.2d 351, 352 (La.1974);
 
 Coco v. Winston Indus., Inc.,
 
 341 So.2d 332, 335 (La.1976).
 

 La. C.C. art. 1998 provides:
 

 Damages for nonpecuniary loss may be recovered when the contract, because of its nature, is intended to gratify a nonpecuniary interest and, because of the circumstances surrounding the formation or the nonperformance of the contract, the obligor knew, or should have known, that his failure to perform would cause that kind of loss.
 

 Regardless of the nature of the contract, these damages may be recovered also when the obligor intended, through his failure, to aggrieve the feelings of the obligee.
 

 The Louisiana Supreme Court also noted in
 
 Young v. Ford Motor Co. Inc.,
 
 595 So.2d 1123, 1133 (La.1992), when faced with the issue of whether nonpecuniary damages were awardable in a redhibitory action, held:
 

 | isThus, under Article 1998, which is the controlling article for the type of damages referred to by the redhibition articles (specifically Article 2545), if it can be established that the obligee intended — and if the nature of the contract supports this contention — to gratify a significant nonpecuniary interest by way of the contract, and that the obligor either knew or should have known that failure to perform would cause nonpecu-niary loss to the obligee, then the requirements for recovery of nonpecuniary damages are satisfied.”
 

 In conjunction, the Louisiana Civil Code’s section on conventional obligations or contracts contains a specific provision regarding the award of damages for non-peeuniary losses resulting from a breach of contract. If the contract breached is not “intended to gratify a nonpecuniary interest,” damages for nonpecuniary losses “may be recovered ... when the obligor intended, through his failure, to aggrieve the feelings of the obligee.” La. C.C. art. 1998. “General damages are those which
 
 *1209
 
 may not be fixed with pecuniary exactitude; instead, they ‘involve mental or physical pain or suffering, inconvenience, the loss of intellectual gratification or physical enjoyment, or other losses of life or life-style which cannot be definitely measured in monetary terms.’ ”
 
 Kaiser v. Hardin,
 
 06-2092 (La.4/11/07), 953 So.2d 802, 808, 809, citing
 
 Keeth v. Dept. of Pub. Safety & Transp.,
 
 618 So.2d 1154, 1160 (La.App. 2 Cir.1993).
 
 [5]
 

 We have already established above that the trial court correctly concluded that Dr. Nelson failed to prove that she was entitled to recover for loss of intellectual enjoyment, which is nonpecuniary in nature. Historically, this is referred to as
 
 dom-mage moral
 
 or damages of a moral nature, not a material or tangible thing. Clearly, this is not a lawsuit involving physical injury, pain or suffering, but one of a tangible loss. There are simply no ascertainable | tanonpecuniary losses. The trial court clearly abused its discretion in awarding general damages. We find that there is merit to the appellant’s argument and reverse the trial court’s granting of $30,000 in general damages.
 

 ATTORNEY’S FEES
 

 The appellant asserts that the trial court erred in awarding attorney’s fees on the basis that the defects were redhibitory. In response to Dr. Nelson’s motion to tax cost and attorney’s fees Integrity stipulated in the record that it does not dispute the amount but does argue that the attorney’s fees were not warranted.
 

 The trial court’s conclusion that Integrity, in its roll as a refurbisher, is therefore a manufacturer squarely fits under the express terms of La. R.S. 9:2800.53.1 and La. C.C. art. 2545.
 

 La. R.S. 9:2800.53. Definitions
 

 The following terms have the following meanings for the purpose of this Chapter:
 

 (1) “Manufacturer” means a person or entity who is in the business of manufacturing a product for placement into trade or commerce. “Manufacturing a product” means producing, making, fabricating, constructing, designing, remanufacturing, reconditioning or refurbishing a product. “Manufacturer” also means:
 

 La.C.C. art. 2545. Liability of seller who knows of the defect; presumption of knowledge
 

 A seller who knows that the thing he sells has a defect but omits to declare it, or a seller who declares that the thing has a quality that he knows it does not have, is liable to the buyer for the return of the price with interest from the time it was paid, for the reimbursement of the reasonable expenses occasioned by the sale and those incurred for the preservation of the thing, and also for damages and reasonable attorney fees. If the use made of the thing, or the fruits it might have yielded, were of some value to the buyer, such a seller may be allowed credit for such use or fruits.
 

 A seller is deemed to know that the thing he sells has a redhibitory defect when he is a manufacturer of that thing.
 

 |2nA manufacturer is conclusively presumed to have knowledge of defects in the object it produces. Since the manufacturer’s knowledge is conclusively presumed, the manufacturer is deemed to be in bad faith in selling a defective product and is liable to the buyer for damages and attorney fees, in addition to the purchase price and expenses occasioned by the sale.
 
 Frentress v. Howard,
 
 31,609 (La.
 
 *1210
 
 App. 2 Cir. 2/24/99), 728 So.2d 1019. Recovery for lost profits is an element of damages which is only allowed against a bad faith seller or manufacturer.
 
 Gaston v. Bobby Johnson Equipment Co., Inc.,
 
 34,028, p. 11 (La.App. 2 Cir. 11/3/00), 771 So.2d 848, 855.
 

 The trial court erred in applying the label of manufacturer to Integrity pursuant to La. R.S. 9:2800.53(1). This statute is governed by the Louisiana Products Liability Act (“LPLA”) not that of the laws of conventional obligations. The Louisiana Products Liability Act, enacted in 1988, provides that it “establishes the exclusive theories of liability for manufacturers for damages caused by their products.” La. R.S. 9:2800.52. However, the LPLA defines “damage” by explicitly excluding amounts recoverable under redhibition for damage to the product and economic loss arising from a deficiency in or loss of use of the product. La. R.S. 9:2800.53(5). Thus, while the LPLA is the exclusive remedy against manufacturers for damages resulting from a defective product, a manufacturer can still be liable for damages in redhibition.
 

 The plaintiff asserted its claims under redhibitory articles, which are a separate cause of action from Louisiana Products Liability statutes. The remedies for a claim under the LPLA and one in redhibition are different in a number of ways. The LPLA is the exclusive remedy against a manufacturer and does not allow for the recovery of attorney’s fees, while attorney’s fees are recoverable from 12)the manufacturer in a redhibition claim pursuant to La. C.C. art. 2545. However, attorney’s fees may be awarded only:
 

 [IJnsofar as those fees relate to the recovery of purely economic loss. This is because much of the proof of a “vice” for redhibition recovery overlaps with proof of a defective product for tort purposes. However, courts in such suits should be careful to realistically allocate recovery costs between the personal injury and economic loss portions of the claim.
 

 DeAtley v. Victoria's Secret Catalogue, L.L.C.,
 
 2004-0661, p. 4 (La.App. 4 Cir. 5/14/04), 876 So.2d 112, 115.
 
 citing
 
 Frank L. Maraist & Thomas C. Galligan, Jr., Louisiana Tort Law § 15-6 (1996) (citations omitted).
 

 Article 2545 sounds in redhibition and as a consumer protection article has its basis in contract as opposed to
 
 ex delicto,
 
 or tort law. The case
 
 sub judice
 
 is a simple breach of contract case not a tort susceptible to a products liability claim. Furthermore, the record before this court is devoid of any evidence to sustain a claim under the LPLA. Clearly, Integrity is only liable, as the trial court concluded, in red-hibition, as the damages were sufficient to be a redhibitory defect.
 

 La. C.C. art. 2545 allows for an award of attorney’s fees in the event a seller is deemed to have known of the defect and fails to declare it. The trial court discredited Integrity testimony that the unit was damaged in transit. In fact it failed to make a clear determination and concluded that the defects existed at the time of the sale and/or occurred during shipping. There was testimony that there was dust in the unit, and there were cracked paddles among other integral missing parts. It is inconceivable that Integrity did not know these problems existed when the unit was shipped, neither did Integrity disclose the problem to Dr. Nelson. As noted above, on Integrity’s worksheet when they originally purchased the unit it was noted that the compression paddles were broken so they were replaced from stock. J^Two side paddles were touched up. The unit was cleaned, checked and calibrated. It is beyond coincidental that the same problems would later be detected when Dr.
 
 *1211
 
 Nelson attempted to have the unit installed. The circumstantial evidence is sufficient to determine that the mammography unit was defective to some level before it was delivered to Dr. Nelson’s clinic. This defect, as noted above, was redhibitory in nature.
 

 The parties have already stipulated to the amount of the attorney’s fees. As we have affirmed these findings, we, likewise, find the trial court properly awarded attorney’s fees in this case. Accordingly, this assignment of error is without merit.
 

 We affirm the judgment of the trial court in all aspects except for the award of incidental and general damages. Accordingly, we amend the judgment to limit monetary recovery, attributable to the cost of the mammography unit itself, $17,575. We further amend the judgment to exclude the $30,000 general damages award.
 

 AFFIRMED IN PART; REVERSED IN PART; AMENDED IN PART AND RENDERED.
 

 [1]
 

 . There is a lease increase to $1,476 on February 3, 2000. It is not clear from the record the circumstances of this increase.
 

 [2]
 

 . Integrity asserts that Dr. Nelson was responsible for the shipping charges. She never paid the cost. Integrity, to maintain its relationship with the shipper, ultimately paid the shipping cost.
 

 [3]
 

 . It is alleged that in 1998, the FDA announced that mammography units that did not use electronic panels would be obsolete after October, 2002. Dr. Nelson admitted that she knew the mammography unit that she purchased from Integrity would be obsolete after October, 2002. This date precedes the end of her lease/purchase agreement with HPSC.
 

 [4]
 

 . A possible concern for accepting Integrity's offer was that it would entail agreeing upon arbitration in Florida.
 

 [5]
 

 . A detailed discussion on the issue of nonpe-cuniary interest in terms of redhibition was discussed above and will not be repeated here.